Whitaker, Judge,
delivered the opinion of the court:
This case, brought by some 117 firefighters at the Tinker Air Force Base at Oklahoma City, Oklahoma, involves their right to compensation for the time they were required to spend on the employer’s premises, subject to call, but during which they were permitted to eat or sleep.
The case arises under the Federal Employees Pay Act of 1945 (59 Stat. 295), and,, for a portion of the period, under the amendment thereof on September 1,1954, designated the Premium Pay Act (68 Stat. 1111; 5 U. S. C. 926).
1. Section 201 of the Federal Employees Pay Act of 1945 reads, in part, as follows:
Section 201. Officers and employees to whom this title applies shall, in addition to their basic compensation, be compensated for all hours of employment, officially ordered or approved, in excess of forty hours in any administrative work week, at overtime rates, as follows * * *.
[For employees receiving compensation of less than $2980 per annum, the overtime was one and one-half times the basic hourly rate of compensation, but, as the basic salary increased, the percentage of the basic rate for overtime decreased.]
The basic question presented is what Congress meant by the words, “hours of employment.” Did it intend to include therein time during which an employee was required to remain on the employer’s premises but during which he could eat or sleep ?
The first cases to reach the courts, in which the meaning of the words was in issue, were Wantock v. Armour & Co., 140 F. 2d 356; 323 U. S. 126; and Skidmore, et al. v. Swift & *661 Co., 136 F. 2d 112; 323 U. S. 134. They involved claims of firefighters for compensation for all the time they were required to remain on the employer’s premises in a standby status, including sleeping and eating time. They arose under the Fair Labor Standards Act, but this Act, as also the Federal Employees Pay Act, required overtime pay for “employment” beyond a certain number of hours. In both cases the employees claimed that all standby time should be included in hours of employment, even though a part of it was spent in eating and sleeping. The employer claimed that, since no labor was performed in any standby time, the employee was not entitled to compensation therefor.
In Wantock v. Armour & Co., supra, the District Court held that the employee was entitled to be paid for all standby time, except that spent in eating and sleeping. The employer appealed, but the employee did not. The Court of Appeals for the Seventh Circuit affirmed, 140 F. 2d 356, and the Supreme Court affirmed, 323 U. S. 126.
This case is authority for the right of the employee to recover compensation for standby time that does not include eating and sleeping time. His right to recover for eating and sleeping time was decided only by the District Court, which held he could not recover therefor.
In Skidmore, et al. v. Swift & Co., supra, the District Court held that the employees were not entitled to recover for any standby time, and the Court of Appeals for the Fifth Circuit affirmed, 136 F. 2d 112. On certiorari by the Supreme Court the lower courts were reversed, 323 U. S. 134. The Supreme Court held that an employee might have the right to recover for standby time, depending on the facts of the particular case, and it remanded the case for findings of fact and for further proceedings. It did not specifically decide whether or not recovery could be had for time spent in eating and sleeping, but it clearly intimated that it could not be.
On pages 138-140 the Supreme Court summarizes Interpretative Bulletin 13 of the Wages and Hours Division, and discusses the weight to be given to it. After summarizing this bulletin the Supreme Court, at page 139, said:
The facts of this case do not fall within any of the specific examples given, but the conclusion of the Ad *662 ministrator, as expressed in the brief amicus curiae, is that the general tests which he has suggested point to the exclusion of sleeping and eating time of these employees from the workweek and the inclusion of all other on-call time: although the employees were required to remain on the premises during the entire time, the evidence shows that they were very rarely interrupted in their normal sleeping and eating time, and these are pursuits of a purely private nature which would presumably occupy the employees’ time whether they were on duty or not and which apparently could be pursued adequately and comfortably in the required circumstances; the rest of the time is different because there is nothing in the record to suggest that, even though pleasurably spent, it was spent in the ways the men would have chosen had they been free to do so.
It then discusses the weight to be given to the views of the Administrator, and concludes,
We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. * * *
In conclusion it noted: “The courts in the Armour case weighed the evidence in the particular case in the light of the Administrator’s rulings and reached a result consistent therewith.”
Since these decisions, employees have been compensated for standby time, although no work was performed therein, but they have been denied compensation for time spent in sleeping and eating, although during that time they were subject to call. It has been generally understood that this was in accord with the clear intimation of the Supreme Court in the above cases, that an employee was not entitled to compensation for time spent in sleeping and eating, merely because such time was subject to possible interruptions.
This has been the uniform holding of our court, except in two cases where substantial labor was performed during the time set aside for sleeping and eating. Winsberg v. United States, 120 C. Cls. 511, under the Overtime Pay Act; Gaetke v. United States, 136 C. Cls. 756,; Collins v. United States, 141 *663 C. Cls. 573; Avary v. United States, 141 C. Cls. 577; and Ahearn, et al v. United States, 142 C. Cls. 309, all under the Federal Employees Pay Act.
In Farley v. United States, 131 C. Cls. 776, and in England v. United States, 133 C. Cls. 768, compensation was allowed because substantial labor was performed during the time set apart for sleeping and eating.
The Court of Appeals for the Seventh Circuit has been of the same opinion. In addition to Wantock v. Armour & Co., supra, see Bowers v. Remington Rand, 159 F. 2d 114, and Bell v. Porter, 159 F. 2d 117, decided after the Supreme Court’s opinion in Wantock v. Armour & Co., supra.
The contract between the Alaska Railroad and its firefighters provided for overtime for standby time, except for eating and sleeping time, for which no compensation was to be paid. Of the total time spent on the employer’s premises, two-thirds were compensable, and one-third, not compensable. In Gaetke, et al., v. United States, supra, we said that .this voluntary agreement between employer and employee “was a sensible and realistic application of the statute [The Federal Employees Pay Act] to the peculiar requirements of plaintiffs’ jobs.”
Later, the Civil Service Commission, which, by section 604 of the Federal Employees Pay Act, was given power to make regulations, promulgated a regulation of the same tenor as the contract in the Gaetke case, to wit, compensation for two-thirds of the time spent on the employer’s premises, and no compensation for eating and sleeping time.
The Comptroller General approved payments made in accordance with the rule. 25 Comp. Gen. 161.
There is thus respectable authority for the exclusion of eating and sleeping time from compensable time spent on the employer’s premises: first, the contract between employer and employee, involved in the Gaetke case; second, the Civil Service Commission regulation; third, the ruling of the Comptroller General; fourth, the decisions of the Court of Appeals of the Seventh Circuit, and of this court; and, fifth, the clear intimation of approval by the Supreme Court in Skidmore v. Swift & Co., supra. Lastly, we think Congress, in the Premium Pay Act of 1954, has given implied approval *664 of the principle underlying the Civil Service regulation. That Act permits a maximum of 25 percent premium pay for standby time. Under the formula of the Civil Service Regulations a firefighter gets paid from 20 percent to 33% percent for his standby time; he receives nothing for eating and sleeping time. (The variance in the percentage depends on his basic pay.)
If these employees are compensated in accord with the Civil Service Regulations and with our previous holdings, they will get approximately the same as what they would get under the Premium Pay Act of 1954.
Not only is this ruling supported by authority, it seems to us to be “a sensible and realistic application of the statute to the peculiar requirements of plaintiffs’ jobs.” When Congress passed the Federal Employees Pay Act, we doubt it had in mind the peculiar situation of firefighters, but it does not seem to us reasonable to suppose it meant to compensate an employee merely because he was required to sleep and eat on the employer’s premises instead of at home. This seems so even if he was subject to call during his sleeping and eating time, and if he was in fact called, provided that he was paid for all hours, except those during which he was actually free to eat and sleep.
We feel assured, therefore, that the regulation of the Civil Service Commission gives effect to the fundamental intent of Congress to fairly and justly compensate Federal employees for their services to the Government. We cannot believe that Congress meant to compensate them for time spent in sleeping on the job. If eight hours out of the 24 were allowed for sleeping and eating, these plaintiffs have been fully compensated.
What are the facts in this case ?
Plaintiffs were on duty on alternate days for 24 hours a day, a total of 72 hours per week. For 40 hours plaintiffs were paid straight time, and for an additional 8 hours they were paid overtime at the statutory rate. For the balance of the time, which was supposed to be devoted to eating and sleeping, they were paid nothing. Plaintiffs were not permitted to sleep during the daytime, but they were permitted to do so from 8 p. m. to 7 a. m., unless during that time some *665 emergency prevented. As a matter of choice, however, many of the plaintiffs retired between 11 p. m. and midnight.
Logs were kept of emergency calls during the time set apart for sleep. These logs do not seem to be as accurate as we would like, but, such as they are, they show a total of about 266 interruptions during sleeping hours in 1954 for “emergency landings”, “crash standby and fireguard”, “gasoline wash down” and “false alarms”, 208 for 1955, and 288 for 1956. All three stations had to respond to an emergency landing alarm. Each such alarm consumed about 20 minutes. There were an average of about 50 per year. Thus approximately 17 hours per year were consumed in answering such alarms. The other alarms consumed from 15 to 30 minutes. Ordinarily only a part of the men from one station answered the other alarms. The average number per year was about 190, or something over 60 per station. If we allow 30 minutes for each alarm, this means 30 hours per year. At a maximum, not more than 50 hours per year, or about one hour per week, are to be deducted from the 11 hours of sleeping time for these interruptions. The miscellaneous interruptions were inconsequential, consuming the time of only one man, probably once a year.
The findings also show that each fireman had to stand watch one hour each night. This makes a total of not more than two hours to be deducted from the time set apart for sleeping. This would leave a total of 9 hours during which plaintiffs were permitted to sleep. In addition to this, they were allowed two hours for eating. Thus, the total time for eating and sleeping was probably about 11 hours out of the 24. There can be no doubt that these plaintiffs were allowed much more than 8 hours for eating and sleeping and, therefore, that they have been compensated for all hours spent in a duty status, except for eating and sleeping time.
The Premium Pay Act of September 1,1954, supra, necessitated the keeping of an accurate account of the number of hours of actual work. The chief of the Fire Protection and Aircraft Crash Rescue Branch, Installations Division, and the chief of the Fire Department and his two assistants, made a calculation of the actual number of hours the firemen worked. (The two assistant chiefs are plaintiffs in this case.) *666 This computation shows that on the average each firefighter worked 32.55 hours per week. Under the Civil Service [Regulation in effect prior to September 1, 1954, they have been paid for 48 hours per week.
It would appear, therefore, that plaintiffs have been compensated for all work actually performed and for all time in a standby status, except for 8 hours set apart for eating and sleeping. Since in fact plaintiffs were allowed more than 8 hours for eating and sleeping, they have been fully compensated under the Federal Employees Pay Act of 1945, sufra.
2. After the passage of the Premium Pay Act of September 1, 1954, supra, some of the plaintiffs elected to come within its provisions, but they now claim compensation on the same basis as the other plaintiffs, because of the provisions of section 401 (b) of the Premium Pay Act, which reads-.“Nothing contained in this section shall be construed to decrease the existing aggregate rate of compensation of any present employee * * However, inasmuch as we have held that under the rate of compensation in effect prior to the passage of the Premium Pay Act of 1954 plaintiffs are not entitled to recover, we do not need, to consider the other provisions of the Premium Pay Act.
It results that plaintiffs are not entitled to recover and their petition will be dismissed.
It is so ordered.
Edgerton, Circuit Judge, sitting by designation; Lara-more, Judge; Madden, Judge, and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. By order of the Commissioner, the trial of this case was limited to the issues of law and fact relating to the right of the plaintiffs to recover, reserving determination of the amount of recovery, if any, for further proceedings. Accordingly, this report deals only with facts relating to the right of plaintiffs to recover.
*667 2. For various periods of time during the 6 years prior to the filing of this petition on March 30,1956, the plaintiffs were employed by defendant as firefighters at the Tinker Air Force Base, Oklahoma City, Oklahoma.
3. The plaintiffs seek to recover overtime compensation for the respective periods of their employment, beginning March 30, 1950, or subsequently, pursuant to the provisions of section 201 of the Federal Employees Pay Act of 1945 (59 Stat. 295), as amended, and extra night pay differential pursuant to the provisions of section 301 of that statute.
4. Tinker Air Force Base, Oklahoma City, Oklahoma, is the largest modem industrial installation in the United States Air Force, and was planned, designed and constructed to be the model air depot of the world.
The land comprising the base amounts to more than 3,300 acres with a total of 528 buildings, having nearly 10 million square feet of floor space, of which 122 buildings are permanent-type construction, 327 are semipermanent, and 79 theater-of-operations type buildings which provide for the various servicing activities necessary to a modem world-wide airbase and for troop housing. The airfield paved area, including aprons, amounts to 1,507,083 square yards. The base has extensive aviation gasoline and jet fuel storage facilities amounting to 1,483,584 gallons.
The estimated replacement cost of the physical facilities is $121,911,344.86. No value is available for aircraft or equipment.
5. The base has the mission of maintaining, repairing and modifying aircraft, aircraft engines, and associated equipment for the United States Air Force in its global activities. In addition, it serves as a center for the repair and overhaul of all types of motor vehicles and carries on a large aircraft supply depot operation. It supplies on a high priority, requirements of vital importance to the United States Air Force.
The repair, maintenance and modification programs of the base are myriad, and encompass the most complicated projects of this character in the Air Force. A review of the historical documents shows practically every variety of aircraft work vital to the air striking force of the United *668 States. For example, 9,670 aircraft engines were processed for repair in 1950, in addition to all other work.
The work performed included that involved in processing B-29’s, B-36’s, B-50’s, and C-54’s, calling for the installation of engines, special equipment, transmission assemblies, fuel cells, governor distributor drive assemblies, etc.
The number of aircraft arrivals and departures for the period July to December, 1956, included 19,770 landings and 20,538 takeoffs, or over 40,000 in the 6-month period.
The base is headquarters for the Western United States in the interior defense system of the Air Force, and maintains and operates 506 fighter planes as a part of this defense. Much information bearing on the important responsibility of the base as a vital part of the United States military system, is classified and cannot be publicized.
6. In 1950, the combined number of military and civilian personnel engaged at the base was approximately 28,240, represented by 23,205 civilians and 5,035 military personnel, with 2,333 military personnel residing on the base. Although these figures have fluctuated, they are fairly representative of the number at the base during the period involved in these claims.
There are today approximately 110 men in the Fire Protection and Aircraft Crash Bescue Branch. The quality of fire protection at the base has been very high, as shown by the fact that the base received first place award among all Air Force installations for the fire prevention week program conducted in the fall of 1949; second place in 1950; third place in 1952; and second place in 1954.
Plaintiffs were recruited on the basis of extensive firefighting experience and training in organized fire departments or the military services, some having a combination of both civilian and military backgrounds in organized firefighting. Some of the plaintiffs have had exclusive military experience in firefighting, with specialized training in crash and structural firefighting schools. It has been the policy of the base to secure men with military background and training in firefighting.
The practice of the base has been to cross-train firefighters in the various firefighting and crash rescue capacities and *669 techniques, so that they are thoroughly experienced in all phases. They are also cross-trained in the use of all equipment, and rotated from station to station on the base, in both structural and crash stations, so that each firefighter is qualified and trained to perform any duty necessary, and has served at all stations.
As a part of their employment, firefighters are required to undergo continual training in firefighting methods. This training is conducted both on the job, and by formal class work, including specialized courses conducted away from the base.
7. The fire department at Tinker Air Force Base, Fire Protection and Aircraft Crash [Rescue Branch, is a component of the Installations Division, and is headed by a fire prevention engineer. The fire department is comprised of 2 sections, the inspection and training section, and the fire department operational and training section.
The inspection and training section is headed by a chief inspector who supervises the activities of approximately 23 inspectors. The duties of this section consist of inspecting all buildings, structures, storage and parking areas; inspecting and testing all installed automatic sprinkler systems and automatic C02 systems, and all automatic manual fire alarm systems. The personnel in this section work on the basis of a 40-hour week, and are not a part of, nor directly related to the operational firefighting group which constitutes the individual plaintiffs in this action.
The fire department operational and training section is organized with a fire chief, 4 assistant chiefs, 17 crew chiefs, 17 drivers, 52 general firefighters, and approximately 20 trainees. All personnel in this section, with the exception of the fire chief, had three 24-hour tours of duty each week from March 1951 to date of the trial. Prior to March 1951, firefighting personnel were employed on the basis of a 60-hour tour of duty per week. The 24-hour tours of duty are from 8 a. m. on one day to 8 a. m. the following day.
Further, an Area Fire Marshal system was in operation at Tinker Air Force Base, under which the base itself was divided into 11 areas, each under the supervision of a marshal who was assisted by numerous unit marshals. While *670 this system was not in any manner connected with the fire department as such, its members now contribute to the welfare of the base in the field of inspections and fire prevention. All building inspections were made by the firefighters until early in 1955. Members of the Area Fire Marshal system are military and civilian employees of the base who perform these fire-marshal duties in addition to their regular duties.
8. All plaintiffs were assigned to one of the three firefighting and aircraft crash rescue stations situated on the base, but were rotated from time to time between all 8 stations.
Station No. 1 is the headquarters station, and serves primarily the military and warehouse area, including the frame buildings which house military personnel and large supply warehouses of both permanent and frame construction, with frame buildings predominating. Its duty roster includes 16 men on each shift.
Station No. 2 is located on the flight line, separated only by a thin wall from the huge flight-operations hangar, and directly under the control tower for the airfield. Primarily, this station protects the flying field, including landings and takeoffs, fueling and refueling of aircraft, and attendant operations. Its duty complement includes 25 men on each shift.
Station No. 3 is located inside the modification hangar. Its primary function is to give protection to the work in modifying and repairing air force aircraft, which work is carried on in Building 3001, and to supply structural protection to Areas B and C and the Thirty-third Air Division. It has a total of 8 men on duty for each shift.
9. The firefighting equipment utilized at the base is especially designed for Air Force use. It is complicated and represents an investment of over one-quarter million dollars. It is not the type of equipment often associated with municipal or institutional structural firefighting. The firefighters are the only persons on the base who have operating responsibility for this equipment. Extensive periods of training are required for proficiency in operation.
The equipment fi’om each station operates over the entire base, and is interchangeable. In the event of an alarm, there *671 is movement of equipment and firefighter crews from all 3 stations. This movement is either in direct response to the alarm or by way of replacement of equipment at a station from which the apparatus has responded.
In addition to alarms for actual fires or explosions and false alarms, there a~re also alarms calling for equipment to stand by in emergency landings, ammunition landings, hospital ship landings, and for takeoffs with respect to all categories of these aircraft movements.
10. Plaintiffs were responsible for the maintenance and operation of the fire stations, and all firefighting and crash rescue equipment. It has been their duty to see that al] equipment is maintained at its full operational capability at all times; to train in firefighting and aircraft crash rescue methods; to demonstrate and train others in firefighting tecimiques, to perform all services requirthg specialized fire prevention and explosion precautions for the protection of life and property, to combat actual fires and explosions, and to rescue personnel from crashed aircraft.
In addition, there were other related duties, such as checking the sprinkler system and its augmenting pumps, and on rare occasions, carrying out surveys of rainfall in storm sewers, for structual modification planning at the base, which made periodic demands.
Among the specific activities of plaintiffs' 24-hour day were the following:
(a) staiidby for emergency landings of aircraft,
(b) engine warmup standby,[1]
(c) washdown of aviation fuel spillage,
(d) structural fires and explosions,
(e) fire calls to nearby èities in accordance with agreement with organized fire departments, Midwest City, population 24,000; Dell City, population 1~000; Oklahoma City,
(f) response to aircraft crashes,
(g) staiiding watch, twice each 24 hours,[2]
(h) standby for hospital aircraft landings and takeoffs,
*672 (i) response to false alarms frequently occurring owing to the extensive and sensitive alarm system at this installation,
(j) closing inspection of officers’ club, NCO clubs, enlisted men’s clubs, bowling alleys,
(k) nightly inspection of paper salvage building,
(l) inspection and maintenance of alarm system at night,
(m) welding standby,
(n) calls from officer of the day for gas detection surveys,
(o) Air Materiel Command tests and inspections which were made periodically, and usually at night,[3]
ip) check for water leaks in closed fire alarm system,
(q) check the water pump system for closed alarm system,
ir) spray painting standby,
(s) inspection of day rooms at night, after closing hours,
(t) refueling and defueling operational standby,
(u) standbys for contractor operations such as cocooning [4] and pickling,
(v) standby on aircraft fuel system tests,[5]
(w) storm sewer water fall inspection,
(xl live ammunition landing and takeoff standbys,[6]
(y) multiple aircraft takeoff and landing,
(z) maintenance of apparatus.[7]
No other personnel was responsible, trained, or authorized to carry out these functions. It was the sole responsibility of the Fire Protection and Aircraft Crash Kescue Branch. In the event of the absence or inability of the firefighters to respond in these areas, the necessary protection and service would not be available.
11. The base operated 24 hours daily for aircraft takeoff and landing, and its mission of servicing, repairing, and modifying aircraft was carried out by three 8-hour shifts of personnel engaged 24 hours a day at all times during the period of claim, so that the base was in continuous activity day and night.
*673 The 24-hour daily operational schedule could not be arranged to suit the convenience of the firefighter plaintiffs or to permit them to sleep at their pleasure. Thus it was necessary for all firefighters to be available for duty all hours of the night, or the function of the base would not be adequately performed. Plaintiffs were subject to call throughout the night hours for the same type of work as through the day hours.
The night hours, like the day hours, required a constant “watch” which was rotated among plaintiffs, so that on each tour one man served watch time once during the day hours and once during night hours. During this watch they were in uniform, and in the station office charged with operation of the alarm and signal system, radio, and telephone communications.
12. Night hours of duty were similar in many respects to daytime duty, and were characterized by the following: Plaintiffs responded to alarms and calls for standby in emergency landings, both routine and crash, hospital ship landings and takeoffs, scrambled or multiple takeoffs and landings, and false alarms. There were calls for standby when either planes or equipment were being repaired, cocooned and pickled, for welding, and for spray painting when hazardous and explosive conditions prevailed. Wash-downs of runways or ships flooded by aviation fuel were frequently required. There were responses to structural and grass fires. Inspection of a specialized paper-burning process and storage had to be made nightly. Various recreational facilities, such as officers’ club, NCO club, day rooms, bowling alley, and theatre had to be inspected after closing hours, which were usually around midnight.
The firefighters were also called on to assume the inspection of operations on the swing and graveyard shifts. The B-29 readiness program from 1949 to 1952 required nighttime standby. There were constant nighttime aircraft engine warmups requiring standby. The Air Materiel Command regular inspection was carried out at night. Calls for inspection of smoke and gas occurrences had to be met at all hours.
*674 13. The equipment used in combating, controlling, and preventing fires was intricate and complex. The nature of its use made it imperative that the equipment be ready for action at a moment’s notice, day or night. Therefore, maintenance duties were continuously performed. After each run a complete check of equipment according to Air Force Regulations and technical orders had to be made to insure performance capability and preservation of the Government’s property. First and second echelon maintenance was performed on all equipment used after each run, day or night, in order that it be ready for the next call. When fire hose was used, it had to be cleaned, dried, and replaced on the trucks; tanks containing chemicals or water had to be recharged immediately; gasoline tanks had to be filled; all pressures of pressurized equipment had to be brought to operational standards. Equipment had to be cleaned and ready for inspection after each call regardless of the hour of the day or night.
14. When a call came, a large fire alarm gong sounded in all stations, and all plaintiffs were required to be fully uniformed in special Air Force firefighting equipment, at their assigned apparatus position.
The nighttime calls were for periods of varied duration, lasting from a few minutes to several hours, and there were some rare occasions when plaintiffs would be up and engaged on calls throughout the night hours. There were nights when there would be a succession of calls for long periods, or several short periods. During some nights there would be no calls, and on a few occasions there would be continuous all-night activity.
Plaintiffs were permitted to sleep at any time from 8 p. m. to 7 a. m., except when called to duty, but it was customary for many plaintiffs to retire, as a matter of choice, between 11 p. m. and midnight.
Plaintiffs were also allowed 2 hours during the 24 for eating.
The general nature and activity of the air base operations over the period of a 24-hour day, is such that there is no distinction from hour to hour, and no distinction between *675 any hour insofar as plaintiffs’ responsibilities for responding to all calls and demands is concerned.
The log summaries record some of the vehicle movements and other activities of the firefighters, and the hour of such activities. Log summaries for 1954,1955, and 1956, show the following number of interruptions from 10 p. m. to 6 a. m. The summary below is derived from defendant’s exhibits 9 (a) through 11 (d) :

From 8 p. m. to 10 p. m. and from 6 a. m. to 7 a. m. there occurred about 20 percent additional interruptions of the nature set out above.
Log summaries for prior years were destroyed pursuant to regulations and are not available. These logs are typical of the activities, except that in prior years, when special projects were undertaken by Tinker Field, the activities were greater, such as during the Korean conflict.
Each plaintiff was required to stand one hour’s watch duty each night.
The same logs show the number of men involved and the time consumed in each of the activities classified above. For an emergency landing, all firemen in a duty status responded. Unless a crash occurred, which was very infrequent, the average time necessary to perform this duty was generally twenty minutes. For crash standby and fireguard, one crash truck containing from four to six firemen responded. The time generally necessary to complete this activity was fifteen minutes. False alarms were answered by two fire engines and caused a third fire engine to come to an active standby status. Such an alarm involved eighteen firemen. The time consumed from the departure of the vehicles until their return was generally fifteen minutes. Gasoline washdowns were performed either by a crash truck or the tank truck. The men involved varied from one to six and the time consumed *676 by each operation was approximately thirty minutes.. Miscellaneous disturbances varied greatly both as to the number of men involved and the time consumed. The vast majority of these disturbances were night inspections of the Tinker Field buildings which involved the services of one man. The logs do not disclose the amount of time such disturbances consumed.
15. During the period of their claim plaintiffs were in a duty status 24 hours, beginning at 8 a. m. and ending the following day at 8 a. m. For the following 24 hours plaintiffs were off duty. During part of the period plaintiffs were on duty 72 hours per week, and during the remainder, they were on duty 60 hours per week.
Plaintiffs were required to be within the coniines of the fire station continuously during the entire 24 hours of each tour of duty, except when on official duty elsewhere. They were not permitted to eat at the air base facilities, but were required to take their noon and evening meals in the fire station.
On September 1,1954, Congress amended the Federal Employees Pay Act of 1945 by adding thereto a new section, 401 (68 Stat. 1111, 5 U. S. C. 926), under which employees, who were required to remain at their duty station in a standby status, were, entitled to receive premium compensation for such standby duty at a certain percentage of their basic compensation, not to exceed 25 percentum, depending upon the number of hours of actual work required in their position and the number of hours they were required to remain at their duty stations in a standby status, etc.
Pursuant to this Act, a calculation was made of the amount of actual work performed by some 47 firefighters at the Tinker Air Force Base in a normal week. Such calculation was prepared by the chief of the Fire Protection and Aircraft Crash Eescue Branch, Installations Division, the chief of the Fire Department, and two assistant chiefs of the Fire Department. The two assistant chiefs are plaintiffs in the present case. This computation is in evidence as defendant’s exhibit 4. It shows that on the average each firefighter worked 32.544 hours per week. On his 3 tours of duty he was assigned to spend time on various activities as follows:

*677
Activities Average roeehlg hours

Administration_ _ 2.30
Maintenance, Equipment and grounds_ _ 9.00
Drills_ _ 3.00
Watch_ _ 4.60
Housekeeping detail:
3 men___ _ 1.50
5 men_ _ 1.90
Standbys and emergency landings_ _ 5.34
Burning scrap lumber pit_ _ . 25
Eire alarms and washdowns_ _ 1.00
Baffle washing_ _ . 052
Welding standbys_ _ . 10
Painting curbs, stations, etc_ _ .06
Changing hose loads_ _ . 15
Testing hose_ _ . 035
Night inspection_ _ . 063
Installing “No Smoking” signs_ _ . 014
Eire prevention and special events_ _ . 18
Classroom work and briefing_ _ 3.00
Total_ 32.544
In general this tabulation accurately reflects the average amount of work done by a firefighter at Tinker Air Force Base in a day or a week, but does not show what amount was done in daytime, or the percentage performed at night.
16. When plaintiffs were employed, it was understood that there would be no distinction between the hours of the day and night, and no specific time was set aside.for the carrying on of any personal activity, such as sleeping or eating. Plaintiffs responded to any and all calls occurring at night in the same manner as during the daytime.
The headquarters office instruction governing plaintiffs’ hours of duty provided “the tour of duty of firefighters will consist of 24 hours on duty and 24 hours off duty.”
17. Dormitory rooms were provided for plaintiffs in the fire stations. The dormitory at No. 2 fire station was immediately adjacent to the area where planes warm up their motors and prepare for takeoffs. Airplanes warmed up at all hours of the day and night, and at times shook the windows of the dormitory where plaintiffs slept. This dormitory was approximately 80 x 50 feet, and accommodated 28 men.
The dormitory in No. 3 station is located in a building *678 utilized for aircraft industrial operations, carried on 24 hours a day in 3 shifts. In addition, aircraft motors are warmed up just outside the building in front of the fire station. For a period of time the dormitory was separated from the break room for employees by a partition that did not go all the way to the ceiling. The time clocks for checking the employees in and out, which include the swing and graveyard shifts, were located in this room. Refreshment dispensing machines were located in this room for the benefit of employees. There is a partition now separating the dormitory and break room. However, there are frequent disturbances by men changing shifts or congregating at the machines. At this station the sleeping area and the eating area are in the same room.
Headquarters Station No. 1 enjoyed the comparative quiet of an active air base free from the immediate outside disturbances experienced at stations No. 2 and No. 3.
18. When plaintiffs were working the 60-hour tour of duty, they were paid for 40 hours at regular base-pay rates, without overtime. When they were working the 72-hour tour of duty, they received pay for 40 hours at base-pay rates, and 8 hours overtime. To state it differently, plaintiffs were paid for two-thirds of their time, on the theory that one-third of the time on duty was spent in sleeping and eating. The night-pay differential to which they were entitled, was computed on the same two-thirds basis. Plaintiffs were allowed no compensatory time off duty, nor were they allowed to sleep during the daytime hours, or given any other special privileges to compensate them for time spent on night duties.
19. As of March 30,1950, the beginning date of the el a im here involved, Air Force Civilian Personnel Instructions, applicable to the employment of civilian firefighters at Air Force bases and installations, provided as follows:
SECTION 2

Policies Governing Establishment Of Tours Of Duty

1. Establishment of Workweeks.
A. Basic Workweek. — The basic workweek at Air Force activities will be 40 hours for all civilian employees exclusive of on-call employees. The tour of *679 duty will consist of five 8-hour days and will be confined, whenever possible, to the period Monday through Friday.
* * * * *
C. On-Gall Tours of Duty. — (1) On-call tours of duty will be restricted to firefighter personnel, both structural and aircraft crash rescue. * * *
SECTION 3

Tows of Duty For Special Types of Employees

1. Fire-Fighter Personnel.
а. Firefighters — Normal Tour. — The normal weekly tour of duty for on-call fire fighters will be 60 hours and will be scheduled so that each member of each shift will have a normally assigned tour of duty which will result in equal distribution of night differential hours in each pay period. The tour of duty will be scheduled so that an employee is on duty two 24-hour shifts and one 12-hour shift in each administrative workweek. Deviations from this tour will be kept to a minimum. In all cases the tour must comprise a minimum of 60 hours in each administrative work week.
б. Firefighters — Special Administrative Workweeks.—
* * * Special administrative workweeks established for fire fighters will be made effective by the written authorization of the commanding officer. * * *
_ c. Other Fire-Protection Personnel. — Fire chiefs, assistant fire chiefs, fire-prevention inspectors, and similar fire-protection personnel may be either oncall or full-time employees with a regular 8 hours a day tour, depending upon their established tour of duty and the requirements of their work assignments.
❖ * * *
Pat Administration
section 1

General Provisions

12. Salary Payment At Basic Rate. — Basic pay is the straight time salary established or limited by statute * * *. Generally the basic rate of pay is applicable for normal work duty * * *. The exceptions to and modifications of this general rule are included in this chapter.
a. Glassification Act Positions. * * *
*680 (1) The basic per annum salary is considered as payment for employment during 52 basic workweeks, each consisting of a 40-hour basic tour of duty, except the weekly tour of duty for on-call employees is 60 hours. Basic pay for a full two-week pay period will be 1/26 of the annual rate. The basic hourly rate of pay is 1/2080 of the annual rate adjusted to the nearest cent (see paragraph 11).
(2) The basic hourly rate, except for on-call employees, will be paid for each hour in a duty status in a basic 40-hour weekly tour of duty except when holiday premium pay is applicable * * *.
(3) On-call firefighters and similar types of employees performing on-call duty will be paid for each hour in a duty status in a basic 60-hour weekly tour of duty at two-thirds of the amount computed at the full basic rate, except when holiday premium pay is applicable. On-call duty outside the regularly scheduled daily or weekly tour of duty hours will be payable at two-thirds of the amount computed at the full basic hourly rate unless the total hours in a pay status exceed 60 hours within an administrative week. When other than on-call duty is performed under the conditions above the full basic hourly rate of pay will be applicable.
(4) Overtime, holiday premium, or night differential pay * * * are not a part of the basic rate of pay. These payments are in addition to basic salary.
ifc # % # #
SECTION 2

Overtime Pay

8. Overtime Work Period. — Generally, all authorized or approved duty in excess of 40 hours in a pay status in an established administrative week constitutes time for which an overtime rate is payable. Modifications or exceptions are as follows:
$ $ ‡ $
o. On-caTl employees. — On-call employees will receive overtime pay, or be granted compensatory time off, for all officially ordered and approved work performed in excess of 60 hours in a pay status in an established administrative week.
CD M CD O ►d s a- cd > S? A1 I a &0 rj- cd- * •• W so g 5-era’® p-o c-t- Hs ha •I S1 ■£ s ph S Sew ^ CQ © * r — ( 43 53 <D ¡3 ^ s a 0+3
*681 C. On-call Employees. — The overtime rate for on-call employees is computed on the same basis as for other Classification Act positions, except:
(1) The overtime hourly rate of pay for on-call duty in excess of 60 hours in an administrative week will be two-thirds of the amount computed at the full hourly overtime rate.
(2) The overtime hourly rate of pay will be the full hourly overtime rate of pay for duty in excess of 60 hours in an administrative week when other than on-call duty is performed, for example, when a firefighter is called to duty to assist in actually fighting a fire outside a regularly scheduled tour of duty.
* * * * *
SECTION 3

Holiday Pay

10. Premium Pay for Holiday Worh.
$ $ ‡ *
g. On-call Employees. — On-call employees will be paid holiday premium pay at two-thirds of the amount computed at twice the straight time rate for authorized work performed on a holiday or the observed day not in excess of 12 how's, which fall within the employees’ regularly scheduled 60-hour basic workweek.
11. Pay When No Holiday Work Performed.
% $ i]i # #
5. On-caTl Employees. — On-call employees who are prevented from working because of the occurrence of a legal holiday, will receive pay for the day for the hours of the tour of duty that fall on the holiday at two-thirds of the amount computed at straight time rates, provided the holiday or the observed day falls within the on-call employee’s regularly scheduled basic 60-hour tour of duty. If the holiday or observed day is outside the basic 60-hour tour of duty, no compensation will be payable for the day unless work is performed.
*****
SECTION 4

Night Pay

7. Night Differental Pay for Glassification Act Positions.

a. Night Differential Bate. — The night differential pay for Classification Act positions is always a flat 10 *682 percent of the hourly basic rate of pay, except as provided in f below. The fact that the some hours may be included in the computation of holiday premium or overtime pay has no effect upon the night differential pay computation.
* # * # #
d. When Payable. — The night differential is payable for those hours of an established tour of duty, including regularly scheduled overtime, falling between the clock hours of 1800 and 0600 the following day * * *.
* * * * *
†. Rate for On-Call Employees. — The night differential pay for on-call employees is two-thirds of the amount computed at 10 percent of the full hourly basic rate of pay, for the time for which night differential payment is proper.
There were various changes in the language of these regulations between August 17, 1949 and November 1954, but these changes did not alter the substance of the regulations.
20. Conditions of employment of firefighters at the Tinker Air Force Base were substantially unchanged from the effective date of the Federal Employees Pay Act of 1945, on July 1,1945, to the date of filing of the petition in this case. At no time prior to the filing of the petition in this case did the civilian firefighters at Tinker Air Force Base formally make known their dissatisfaction with conditions of their employment, including pay adjustments, by means of a grievance procedure ,which was available to handle such matters subsequent to the passage of the Federal Employees Pay Act of 1945.
In 1948 approximately 35 firefighters at the Tinker Air Force Base, including a number of plaintiffs in this case, addressed letters to the Army Finance Center, and to the General Accounting Office, claiming improper payment under Public Law 573, 79th Cong., 2d Sess., which contained language somewhat similar to the 1945 Federal Employees Pay Act.
This effort to obtain additional compensation was common knowledge among the firefighters at the base, who were also acquainted with similar action on the part of other firefighters at an airbase in Texas. Replies were received, denying their right to additional compensation, although the *683 General Accounting Office did assign claim numbers to each of the letters addressed to it by individual firefighters. This was also common knowledge among the firefighters at the base, and further letters were not sent, as it was considered a useless gesture. Many firefighters had not participated in the submission of claims originally, because they understood that if one claim were allowed all would be given the same consideration.
The dissatisfaction and controversy as to the proper method of payment of the firefighters was known to the civilian personnel office on an informal basis. However, no official action was taken by that office, as it was felt that the firefighters were being properly paid for services rendered, in accordance with the regulations of the War Department, or the Department of the Air Force, for the applicable periods of these claims under the two departments.
21. The record discloses that the turnover in the fire department personnel was very small, and that no firefighter, who did leave, attributed his departure to any dissatisfaction with conditions of employment as they existed at the time.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover, and their petition is therefore dismissed.

 Station No. 2 was responsible for this: Only had to respond when called.

 time on this duty during nighttime Is approximately 1 hour per man.

 Now usually performed during the daytime.

 Materials used were highly inflammable; terminated in 1951.

 This only lasted about 9 months; discontinued in 1952.

 This is a standby operation for all such landings and takeoffs because of the cargo involved.

 Military personnel attached to Station No. 1 for brief periods assisted in cleaning the station and apparatus.