**Robert GRAHAM et al.**

v.

**The UNITED STATES.**

**No. 358–81C.**

United States Claims Court.

Nov. 30, 1983.

Mike Milligan, El Paso, Tex., for plaintiffs.

Frances L. Nunn, Washington, D.C., with whom was Asst. Attys. Gen. J. Paul McGrath, David M. Cohen, and Thomas W. Petersen, Washington, D.C., for defendant.

## MEMORANDUM OF DECISION

WHITE, Senior Judge.

The plaintiffs are 43 individuals who were employed by the Department of the Army as civilian fire fighters and assigned to the Fort Bliss Fire Department before, during, and after the period which began on March 17, 1976, and ended on February 23, 1977. (For the sake of convenience, this period will generally be referred to hereafter as "the period in question.")

The plaintiffs' basic claims, as set out in the complaint,[1] are similar and are to the effect that, during the period in question, the Chief of the Fort Bliss Fire Department "required Employees to report to their work area in a dress uniform at the beginning of their duty shifts and to leave the work area in a dress uniform at the end of their duty shifts approximately twenty-four (24) hours later"; and that "the additional time required of Employees for changing into and out of uniforms from and after March 17, 1976, constituted work," for which the plaintiffs should receive compensation at the overtime rate.

It is concluded that the plaintiffs are not entitled to recover.

### The Facts

The fire fighters of the Fort Bliss Fire Department are assigned to, and work out of, different fire stations, located at Fort Bliss, at Biggs Field, at Beaumont Army Hospital, and at McGregor Range. All the fire stations are within the general vicinity of El Paso, Texas.

Members of the Fort Bliss Fire Department are a uniformed force. They were

---

1. Filed as a petition in this court's predecessor, the United States Court of Claims.

subject at all relevant times to the provisions of chapter 5 of Army Regulation 670–10, covering the subject of "Uniforms and Allowances for Civilian Fire Fighters." Chapter 5 provided in part as follows:

5–3. Policy. Civilian fire fighters will be uniformed for the purpose of ready identification in the performance of official duty. Uniform design and color will be in accordance with requirements specified in paragraph 5–6.

\* \* \* \* \* \*

5–5. Appearance. Installation commanders will take such steps as are necessary to insure that employees' uniforms meet minimum standards prescribed by this regulation, that employees are properly attired, and that uniforms are kept clean and neat.

Paragraph 5–6 of chapter 5 dealt with "Items of uniform." It provided in general language (among other things) that the standard uniform color for civilian fire fighters should be blue; that the cap should be a fireman type and of a similar or identical fabric as the uniform; that the necktie should be a plain black four-in-hand; that the coat should be of a woolen or worsted fabric; and that the trousers should be of a conventional type, matching the coat in color and fabric.

Supplementary directives, prescribing more specifically the uniform for members of the Fort Bliss Fire Department, were issued from time to time by the responsible authority at Fort Bliss.

Before the period in question, the winter uniform prescribed for members of the Fort Bliss Fire Department—commonly referred to as the winter class A uniform—included a dark-blue woolen jacket (the style of the jacket was changed at least once before the period in question) and trousers, dark-blue fireman-type cap, blue long-sleeved shirt, black tie, black shoes, and certain stripes, patches, and insignia. The summer class A uniform did not include a jacket or necktie, the dark-blue trousers were of a light-weight material, and the blue shirt was short-sleeved and was worn open at the collar.

The Fort Bliss fire fighters received from the Department of the Army an initial clothing allowance for the purchase of their first class A winter and summer uniforms, and they subsequently received an annual clothing allowance out of which they were required to finance the necessary cleaning of the class A uniforms and the purchase of any uniform items that had to be replaced.

Except for the conduct of inspections within the areas for which they were responsible, members of the Fort Bliss Fire Department did not wear the class A uniform while engaged in the performance of their duties. Instead, they wore gray cotton work clothes, consisting of shirt and trousers, which the fire fighters purchased with their own funds at stores such as J.C. Penny Company or Montgomery Ward & Company. The work shirt was usually long-sleeved in winter and short-sleeved in summer. (Witnesses sometimes referred to the gray work clothing as the "work uniform"—although it was not prescribed by regulation or official directive—and sometimes as "the grays.")

The regularly prescribed tours of duty for a Fort Bliss fire fighter consisted at all relevant times of three 24-hour shifts each week, making a total of 72 hours of duty per week.

Before, during, and for at least a time after the period in question, the shifts at the various fire stations began at 8 a.m. and ended 24 hours later, at 8 a.m. the next day. The members of one shift at a station began their prescribed 24-hour tour of duty at the same time as the members of the immediately preceding shift at the same station completed their prescribed 24-hour tour of duty.

At 8 a.m., as members of a shift began their 24-hour tour of duty at a fire station, they were required to stand a roll-call formation. The members of the same shift, as they completed their 24-hour tour of duty at 8 a.m. the next day, were required to stand another roll-call formation. Thus, each fire fighter customarily stood a total of six roll-call formations each week, three

at the beginning of the 24-hour tours of duty and three at the conclusion of the tours of duty.

After reporting to their respective fire stations for a 24-hour tour of duty, Fort Bliss fire fighters customarily received from their supervisors, before the beginning roll-call formation, information concerning the nature of their initial work assignments (*i.e.*, whether they were to perform inspection duties or some other type of work).

Before the period in question, Fort Bliss fire fighters who were scheduled to begin a 24-hour shift on a particular day would ordinarily put on their work clothes at home, travel to the fire station in work clothes, and, unless the first work assignment was the performance of inspection duties, would stand the beginning roll-call inspection in work clothes. If a fighter's initial assignment was to perform inspection duties, he would usually change from work clothes into the class A uniform at the station before the roll-call formation, and stand the formation in the class A uniform. Fire fighters were not compensated for the time spent in putting on work clothes at home or in changing into the class A uniform at the station.

As a matter of common practice before the period in question, Fort Bliss fire fighters ordinarily stood the roll-call formation at the end of a 24-hour shift in work clothes, and then wore the work clothes home.

Before the period in question, it sometimes happened that a Fort Bliss fire fighter would expect to go from the fire station to a destination other than home at the end of a 24-hour shift. If so, the fire fighter generally carried civilian clothing to the station[2] and then, if the work load permitted, he would take a few minutes just before the end of the 24-hour shift and change from work clothes into civilian clothes. In such a situation, he would stand the roll-call formation at the end of the shift in civilian clothes and leave the station wearing civilian clothes. The fire fighter's pay was not "docked" for the time spent in changing clothes.

In January 1976, Walter L. Henegar was appointed as the new Chief of the Fort Bliss Fire Department. Chief Henegar was displeased by what he regarded as the unsatisfactory appearance of the Fort Bliss fire fighters as they stood the roll-call formations at the beginning and at the end of the 24-hour tours of duty, with some of the men wearing work clothes and others wearing class A uniforms at beginning formations, and some wearing work clothes and others wearing civilian clothes at ending formations.

On March 17, 1976, Chief Henegar issued a new directive with respect to the uniform for Fort Bliss fire fighters. For one thing, the March 1976 directive changed the design of the winter coat from the Eisenhower-type jacket previously prescribed to a double-breasted coat, with two rows of brass buttons down the front of the coat. However, the only significant part of the directive, from the standpoint of the present litigation, was the statement that "All personnel are expected to wear the uniform to and from duty."

The preponderance of the evidence in the record shows, and it is found, that Fort Bliss fire fighters generally interpreted the statement quoted in the preceding paragraph as meaning that a fire fighter must be attired in the class A uniform when he arrived at the fire station for the beginning of a 24-hour shift, and when he departed from the fire station after completing a 24-hour shift. Most fire fighters met this supposed requirement by putting on the class A uniform at home before leaving for the fire station to begin a 24-hour shift; and, if they were wearing work clothes near the end of a 24-hour shift, by changing into the class A uniform just before the end of the shift, and wearing the class A uniform home (or to whatever place might be a fire fighter's destination on the particular day).

---

2. As stated previously, it was customary for fire fighters, before the period in question, to wear work clothes from home to the fire station.

Evidence in the record indicates that, in a few instances, a fire fighter, wearing some other type of clothing, would drive in a van to the parking lot at the fire station, change into the class A uniform in the van, and then report to the station in the class A uniform for the beginning of a 24-hour shift. After the end of the 24-hour shift, such a person would wear the class A uniform to the van, and change into other clothing in the van. There is no evidence in the record that any of the plaintiffs followed this procedure.

On February 23, 1977, Chief Henegar issued a new directive with respect to the wearing of the uniform by Fort Bliss fire fighters. The previous statement that "All personnel are expected to wear the uniform to and from duty" was replaced by provisions stating that personnel "coming on duty" would stand roll call in the dress blue uniform, but that personnel "going off duty" might stand roll call in civilian attire if that was an individual's preference, and that personnel might "go to and from duty" in civilian attire if anyone wished to do so.

After the issuance of the directive dated February 23, 1977, the customary practice concerning the attire of Fort Bliss fire fighters was much the same as it had been before March 17, 1976, except that it was necessary after February 23, 1977, for the fire fighters to be attired in the class A uniform when standing the 8 a.m. roll-call formation at the beginning of a 24-hour shift. After February 23, 1977, however, fire fighters generally wore other clothes from home to the fire station (instead of wearing the class A uniform from home, as they did during the period in question) and then changed into the class A uniform at the station before standing the roll-call formation at the beginning of a shift.

### Discussion

The testimony presented at the trial on behalf of the Government was mainly to the effect that Chief Henegar, in issuing his directive of March 17, 1976, did not intend to require—and Fort Bliss fire fighters were not justified in interpreting the directive as requiring—that fire fighters must wear the class A uniform to and from work. Instead, according to the Government's testimony, the directive only meant that fire fighters must be attired in the class A uniform when they stood the roll-call formation at the beginning of a 24-hour shift and when they stood the roll-call formation at the end of a 24-hour shift.

■ Although there was a certain amount of ambiguity in the statement that "All personnel are expected to wear the uniform to and from duty," the interpretation placed upon it by Fort Bliss fire fighters was reasonable. Indeed, the firefighters' interpretation seems more reasonable than that of the Government, as the statement that personnel should wear the uniform "to and from duty" certainly carried with it the connotation that fire fighters should be in proper uniform when they appeared at and departed from the *place* of duty, *i.e.,* the fire station. Consequently, it is held that the directive of March 17, 1976, required Fort Bliss fire fighters to be attired in the class A uniform when they arrived at the fire station for the beginning of a 24-hour shift, and when they departed from the fire station after completing a 24-hour shift.

This does not mean, however, that the plaintiffs are entitled to recover in the present action.

The gist of the plaintiffs' claims seems to be set out in the portion of the complaint which states that "All of the additional time required of Employees when changing into and out of uniforms from and after March 17, 1976, constituted work," for which the plaintiffs are entitled to compensation at the overtime rate.

The legal authority relied on by the plaintiffs in support of their contention that the time spent in "changing into and out of their uniforms" pursuant to the directive of March 17, 1976, was working time seems to be 29 U.S.C. § 254(b) (1976). This section does not provide the needed legal support.

Section 254 first provides in subsection (a) that no employer shall be liable under

the Fair Labor Standards Act of 1938, the Walsh-Healey Act, or the Davis-Bacon Act for time spent by an employee in traveling to and from the place of employment, or for time spent in activities which are preliminary to or postliminary to an employee's principal activity. The section then provides in subsection (b) that, notwithstanding the provisions of subsection (a), an employer will not be relieved of liability to compensate an employee for an activity which is compensable under "an express provision of a written or nonwritten contract in effect at the time of such activity * * *," or under "a custom or practice in effect, at the time of such activity, at the establishment or other place where such employee is employed, covering such activity * * *."

Unfortunately for the plaintiffs, there is no evidence in the record indicating that there was in effect at the time for which additional compensation is sought—or at any other time—"an express provision of a written or nonwritten contract," or any "custom or practice," under which Fort Bliss fire fighters were entitled to compensation for time spent in putting on the class A uniform before standing the roll-call formation at the beginning of a 24-hour tour of duty, or for time spent in taking off the class A uniform after completing a 24-hour tour of duty.

It has been mentioned in the summary of the facts that, before the period in question, Fort Bliss fire fighters customarily wore work clothes to the fire station before beginning a 24-hour tour of duty; and if a fire fighter's initial work assignment for the tour was the performance of inspection duties, he would usually change into the class A uniform at the station before standing the roll-call formation. There is no evidence that, in such a situation, any fire fighter ever received, or even requested, overtime pay for the few minutes required to make the change from work clothes into the class A uniform.

Before the period in question, insofar as the evidence in the record is concerned, there was no occasion for a Fort Bliss fire fighter to change from the class A uniform into some other type of clothing after the end of a 24-hour tour of duty, as it was customary for fire fighters to be wearing work clothes at the end of a shift and to stand the closing roll-call formation in work clothes (except for those who had changed into civilian clothes in order to go to a destination other than home).

It is clear that 29 U.S.C. § 254(b) does not have any applicability to the present case.

The plaintiffs were government employees during the period in question; and the law is plain that government employees are entitled to overtime compensation for time spent outside the regularly prescribed hours of duty only if the employees perform a substantial amount of labor in the interest of the Government during such time. *Armstrong v. United States,* 144 Ct.Cl. 659, 662–63, *cert. denied,* 361 U.S. 825, 80 S.Ct. 72, 4 L.Ed.2d 68 (1955); *Rapp v. United States,* 167 Ct.Cl. 852, 866, 340 F.2d 635, 642–43 (1964). (It is also necessary that the work be ordered or authorized by competent authority, but the defendant does not argue in the present case that the Chief of the Fort Bliss Fire Department lacked the authority to issue the directive of March 17, 1976.)

There is nothing in the evidence to indicate that, during the period in question, it took the plaintiffs any longer to put on the class A uniform at home before reporting to the fire station than it would have taken them to put on work clothes at home, as they customarily did before the period in question. After they reported to the station and stood the roll-call formation in the class A uniform, the Government paid them for the time that they spent in changing from the class A uniform into work clothes (if they were not going directly to the performance of inspection duties).

With respect to the time which was required, during the period in question, for the plaintiffs to change from work clothes into the class A uniform just before the end of a 24-hour shift in order to stand the

roll-call formation at the end of the tour of duty, the plaintiffs have already been compensated for that activity. The time devoted to the change of clothing then was part of the 24 hours of duty which the plaintiffs owed the Government in exchange for their regular pay. Of course, when a plaintiff reached his home (or other destination) attired in the uniform pursuant to the directive of March 17, 1976, some extra time was required to change from the uniform into other clothing. (Before the period in question, a plaintiff could already be attired in other clothing—including civilian clothes, if preferred—when he stood the roll-call formation at the end of a shift and departed from the station.) However, the evidence shows that only a short period—8 to 15 minutes—was required to make the change from the class A uniform to other clothing at home (or other destination). This occurred three times a week, so that total amount of time involved in such activity varied from approximately 24 minutes to approximately 45 minutes per week. This small amount of time per week should be regarded as *de minimis. Cf. Bantom v. United States,* 165 Ct.Cl. 313, 318, *cert. denied,* 379 U.S. 890, 85 S.Ct. 161, 13 L.Ed.2d 93 (1964).

Furthermore, it should be noted that, in the present case, the plaintiffs, during the period in question, put on the class A uniform at their own convenience and at home before reporting to the fire station to begin a 24-hour shift, and they changed from the class A uniform into other clothing at their own convenience and at home (or other destination) after completing a 24-hour shift. Under the circumstances, the few minutes involved in such activities could hardly be regarded as a substantial amount of labor, for which the plaintiffs ought to be compensated. *Cf. Baylor v. United States,* 198 Ct.Cl. 331, 337 (1972); *Catalfamo v. United States,* 200 Ct.Cl. 689, 692–93 (1973).

## CONCLUSION OF LAW

On the basis of the memorandum of decision and the facts, as found by the court and stated in the memorandum of decision, the court concludes as a matter of law that the plaintiffs are not entitled to recover.

The complaint will therefore be dismissed.

IT IS SO ORDERED.