Whitaker, Judge,
delivered the opinion of the court:
Plaintiffs, civilian security guards employed by the Norfolk Naval Shipyard, Portsmouth, Virginia, sue to recover at overtime rates for duties, said to have been performed pursuant to official order or approval, in excess of 40 hours in each administrative workweek, as provided by section 201 of the Federal Employees Pay Act of 1945, 59 Stat. 295, as amended, 68 Stat. 1109 (1954), 5 U.S.C. 911 (1958).
By regulation, plaintiffs were required to report 15 minutes before their tour of duty began, but, actually, they reported at least 20 minutes before. The Trial Commissioner in his opinion concludes that plaintiffs are entitled to 20 minutes overtime. We think they are entitled to only 15 minutes. On other phases of the case we aré in substantial agreement with the Commissioner.
Midway on the east coast, the Hampton Boads area, wherein the Norfolk Naval Shipyard is located, is one of the great natural harbors of the world. The Shipyard, a military installation under the command of a Naval officer, has *359 as its primary function shipbuilding and ship maintenance for the Navy. Because it is a military installation, an around-the-clock security force is required to man specified posts throughout the installation proper. Both civilian and military personnel have been utilized for this purpose.
During all times herein material, the civilian guard force was under the supervision of the Security Officer, a commissioned officer of the United States Marines; and the direct administration and supervision of the guard force was performed by the Chief of Police. The guard force operated on the basis of three 8-hour shifts per 24-hour period. The activities and operation of each of the three daily shifts were supervised by a “Captain of the Watch” who was directly responsible to the Chief of Police.
Sometime prior to, but effective during this period, the Security Office had caused to be issued specified written regulations governing the functions of the civilian guard force. Under the heading “General Instructions” appeared the following:
12. Beport to police headquarters fifteen minutes before going on duty.
Each of the 19 posts manned by civilian guards was subject to specified duties which were set out in detail in the regulations. Seven of the posts were stationary, manned by one guard at each post. Six posts were foot patrol posts and each was manned by one guard. Four posts were motorized patrols, each of which was manned by two guards. Post No. 8 was a combination gate post and motorized patrol post manned by one guard. Post No. IT was police headquarters ; it was manned by the supervisory sergeant and was the base from which the Lieutenant and Captain of the Watch operated. While only 13 posts were manned 24 hours a day, all posts were relieved following the termination of each shift by personnel who had previously checked in at police headquarters, with the exception of Post No. 8. Post No. 8 was 4%0 miles from police headquarters, and due to this location the guards relieved each other directly and checked in at headquarters by telephone. It took two to ten minutes to get from the guardhouse to the various posts, de *360 pending upon their varying distances from the guardhouse, traffic conditions and weather. Thus, prior to the regulation requiring the guards to report to the guardhouse 15 minutes before reporting for duty at their assigned posts, there was a short period of time in which a post would be unmanned while the shift going off duty was reporting to the guardhouse and the incoming shift was en route to the various posts. It was essential for security purposes that the posts be manned continuously throughout each 24 hours without interruption. This regulation was designed to provide for this.
The guards were required to be in proper uniform and neat in appearance. Some wore their uniforms to and from work, while others wore civilian clothes and changed into their uniforms at the guardhouse. The procedure generally followed by a guard, after donning proper uniform, was to punch the timeclock, draw his pistol (which took about 20 seconds), stand muster for attendance and physical inspection, and receive special instructions and assignments (the latter being posted a week in advance, but subject to change). He then proceeded to his assigned post, either on foot or in transportation provided for the most distant posts. Those assigned to vehicles made a cursory inspection of the vehicle to insure it was in proper operating condition.
The parties stipulated that, according to the available logbooks, the guards were mustered on the average of 20 minutes before the beginning of their tour of duty. There was no written order requiring this early muster, and both the Security Officer and the Chief of Police not only deny having given an oral order to this effect, but they also deny having any knowledge that the muster was being held five minutes in advance of the time the regulation required the guards to report for duty. While there is no evidence that the plaintiffs were more than admonished for failing to report for duty earlier than 15 minutes prior to the start of the shift, the evidence indicates that it was tacitly understood between them and the Captains of the Watch that they should be available for muster at 20 minutes to the hour. (It appears that many of the guards voluntarily arrived at the guard *361 house as much as an hour early, enabling them to make their preparations at their leisure.)
In our opinion, a “tacit expectation” is not equivalent to the statutory requirement of “official order or approval.” The plaintiffs not only have the burden of proving that they were ordered to appear 20 minutes before the shift started, but also that the order was issued by one having the authority to do so. Although the Security Officer had such authority, and perhaps the Chief of Police also, the testimony is uncontroverted that neither gave such an order.
However, plaintiffs would have us find “approval” on their part by attributing to them knowledge of the actual practice and their ensuing silence. There is no testimony that they issued such an oral order nor that they had actual knowledge of the practice; nor do we think knowledge is to be inferred in the face of the Security Officer’s own written regulation requiring the guards to report 15 minutes before the hour, instead of 20 minutes. The Government concedes that the plaintiffs were validly ordered to report 15 minutes before the hour, and that this entitled them to 15 minutes overtime, but no more. We concur and so hold.
However, the defendant would offset against this overtime the time taken by plaintiffs for their meals, which the defendant says exceeds the claimed overtime. We do not think defendant is entitled to this offset. The regulations did provide, in paragraph 17, that “Guards may visit canteens on their posts for necessary meals”; but most of the guards brought their food from home and ate on the job at their assigned posts. No definite time for meals was provided in the assignment schedules or otherwise in the regulations. The canteens were of the “stand up” or “carry out” variety. There was not one on every post, and there were fewer open in the evening shift than in the day shift. None were open in the night shift. The cafeteria was open only during the day shift. The guards could utilize canteens off their posts or could eat at the cafeteria only upon being granted special permission, in which case a “relief” took the post during his absence. The record reveals that such requests were rarely made. But the essential thing is that the amount of time any *362 particular guard took off for meals is not shown by the testimony.
But defendant says that since the regulations permitted the guards to visit the canteens for meals, eating time is to be deducted even though the guards were walking post while they were eating. This is manifestly unsound. A non-compensable lunch period is an off-duty period, which these plaintiffs did not have, and could not have as the schedules existed, unless relieved, due to the nature of their employment as security guards and the requirement of management for maintaining constant surveillance.
Defendant says plaintiffs have been guilty of laches. Plaintiffs’ petitions were filed in 1961, but the ground they assert therein existed at least as early as 1950, a delay of 10 years or more, which is neither explained nor excused. (Plaintiffs claim the right to recover only for the 6 years prior to the filing of their petitions.)
Laches is grounded in equity and requires for its application not merely delay, but an inexcusable delay, coupled with resulting prejudice to the defendant. In O'Brien v. United States, 148 Ct. Cl. 1, in an opinion written for the court by Judge Durfee, we said:
It is only where some great injustice would be done the defendant by so long a delay by the claimant that the doctrine of laches should be set up to defeat consideration of the claim on the merits. The equities on both sides should be carefully weighed, and it should be clear that they weigh heavily on the side of the defendant before the court refuses to hear a case because of a delay of less than the statutory period.
Laches has been raised as a defense to pay actions in this court on numerous occasions, primarily in the areas of wrongful separation, reduction in rank, and overtime pay. While we have, on occasion, allowed the defense in the case of wrongful discharges (Bailey v. United States, 144 Ct. Cl. 720, 171 F. Supp. 281 (1959); Miner v. United States, 143 Ct. Cl. 801; Stager v. United States, 57 Ct. Cl. 116), it has not been allowed in actions for overtime pay (Aviles, et al., v. United States, 151 Ct. Cl. 1 (1960) ; Ahearn, et al. v. United States, 142 Ct. Cl. 309; Winsberg v. United States, 120 Ct. *363 Cl. 511; Poggas v. United States, 118 Ct. Cl. 385). The reason for this is defendant may be prejudiced by tbe delay in one case, but not in tire other. Where the defense has been allowed, the defendant has been injured because it has employed another to replace the discharged employee and, thus, has been required to pay two salaries for a period of time, which it would not have been required to pay had the plaintiffs filed their suits more promptly. This factor is lacking in the cases involving overtime.
The only answer defendant gives in these cases to the question of “How is the Government prejudiced by plaintiffs’ delay?” is that it will have to pay the amount of overtime pay for which the suits were instituted. This is no answer at all. Is not the Government really saying that if it had known that plaintiffs were going to sue for the overtime pay to which they were entitled, it would have changed its rules, so that there would have been no overtime ? These cases do not present a situation which warrants the application of the doctrine of laches.
Defendant’s plea of estoppel is plainly untenable.
We, therefore, hold that while eating, the plaintiffs were still on uninterrupted guard duty, for which they are entitled to receive full compensation. Plaintiffs may recover for 15 minutes overtime, and judgment will be entered to that effect. The amount of recovery will be determined in accordance with Buie 38(c).
In the James Powell claim (plaintiff No. 9 in the case of Baker, et al., v. The United States, No. 323-61), defendant filed a counterclaim on the ground that the Veterans’ Administration had paid him more than he was entitled to, but no proof was introduced in support of it. Consequently, it is disallowed and the counterclaim is dismissed, without prejudice.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiffs are all citizens of the United States, and for various periods of time during the six years immediately *364 preceding the filing of the petitions in these oases, they were employed by the defendant as civilian guards at the Norfolk Naval Shipyard, Portsmouth, Virginia. The petition in the' Albright case, No. 263-61, was filed on July 8, 1961, and the petition in the Baker case, No. 323-61, was filed August 15,1961. The two petitions concerned herein were consolidated for all purposes since they involved identical factual situations and legal principles.
2. The plaintiffs seek to recover overtime compensation for the respective periods of their employment falling within the six years preceding the filing of the respective petitions pursuant to the provisions of Section 201 of the Federal Employees Pay Act of 1945, 59 Stat. 296, as amended, 68 Stat. 1109 (1954), 5 TJ.S.C. 911 (1958). The basis of the claim, as modified by plaintiffs subsequent to trial, is that they were required to report for duty at least 20 minutes prior to the commencement of each 8-hour tour of duty in order to perform certain routine duties in connection with being mustered and assigned to their duty posts. The defendant seeks to offset such periods of extra duty with time taken by the plaintiffs for their meals.
3. The Norfolk Naval Shipyard is located on the Southern Branch of the Elizabeth Fiver, an estuary flowing into Hampton Roads, some 15 miles from the entrance to the harbor, in Portsmouth, Virginia. Strategically located midway on the east coast, the Hampton Roads area is one of the great natural harbors of the world. The Shipyard •is one of the oldest maintained by the Navy and comprises an area of approximately 874 acres, on which are located various buildings, shops, piers, slips and drydocks. The primary function of the Shipyard is shipbuilding and ship maintenance for the Navy. The Shipyard is under the command of a Naval officer, with the title of “Commander, Norfolk Naval Shipyard.” Because it was a military installation, an around-the-clock security force was required to man specified posts throughout the installation proper. Both civilian and military personnel were utilized in manning security posts.
4. (a) At all times material herein, the civilian guards at the Shipyard were employed on the basis of an 8-hour *365 working day, five days per week. The guard force operated on the basis of three 8-hour shifts per 24-hour period with the guards manning these shifts, as a general rule, on a rotation basis. The shifts were referred to as the day-shift, 7 a.m. to 3 p.m.; the evening shift, 3 p.m. to 11 p.m.; and the midnight shift, 11 p.m. to 7 a.m.
(b) The civilian guard force at the Shipyard was under the supervision of the Security Officer of the Shipyard, a commissioned officer of the United States Marine Corps. The direct administration and supervision of the guard force was accomplished by the Chief of Police. The activities and operation of each of the three daily shifts were supervised ¡by a “Captain of the Watch” who was directly responsible to the Chief of Police.
(c) The Security Office caused to be issued specified regulations, which were in effect at all times material herein, governing the functions of the civilian guard force setting out (1) general orders relative to the overall duties of all guards; and (2) post orders governing the specific duties of the guards within a bounded post or area. In the general orders under the heading “G-eneral Instructions”, the following instructions appear:
12. Report to police headquarters fifteen minutes before going on duty.
*****
17. Guards may visit canteens on their posts for necessary meals.
* * ❖ * *
20. Each guard shall sign his name on a card provided by the chief of police to the effect that he has been instructed in his duties and that he understands both the general and special orders.
These general orders were reissued on September 1, 1960, and each civilian guard was required to initial the regulations as reissued to indicate that they had read them and were familiar with the general and special orders contained therein.
(d) The civilian guards were responsible for some 19 posts at the Shipyard, each post subject to the performance of specified duties which were set out in detail in the regula *366 tions. Seven posts (Nos. 9, 11, 12, 13, 14, 15 and 18) were fixed or stationary posts and each, was manned by one guard. Six posts (Nos. 1, 2, 3, 10, 16 and 19) were foot patrol posts and each, was manned by one guard. Four posts (Nos. 4, 5, 6 and 7) were motorized patrol posts and eacb was manned by two guards. Post No. 8 was a combination gate post (fixed) and motorized patrol post manned by one guard. Post No. 17 was police headquarters and was manned by the supervisory sergeant and was the base from which the Lieutenant and Captain of the Watch operated. Only 13 posts were manned 24 hours a day, 7 days a week (Nos. 1, 2, 3, 4, 5, 6, 7, 8, 10, 13, 16, 17 and 19). The remaining posts were manned 8, 10 or 11 hours per day, 5 or 6 days a week. Post 13 (Gate 51) was the most distant post relative to relieving the shifts, from police headquarters, being some 24/10 miles therefrom. All posts were relieved following the termination of each shift by personnel who had previously checked in at police headquarters with the exception of Post 8 (St. Helena) where, because of its location on the other side of the river, guards relieved one another at that post without first appearing at police headquarters, said checking in with headquarters at this post being done by telephone. Post 8 was 4%0 miles from police headquarters. The regulations also provided that in the event of shortage of personnel, posts could be reduced by one guard in the following order: Post No. 4, then 6, then 5, and finally 7.
5. The shift arrangement described in the preceding finding did not provide unbroken security, in that during the changing of the shifts the duty posts would be temporarily not manned while the shift going off duty would be returning to the guardhouse and the incoming shift would be leaving the guardhouse en route to the numerous duty posts, for it took from two to ten minutes to get from the guardhouse to the various posts, depending on their varying distances from the guardhouse, traffic conditions, and weather. To cure this problem the regulations required the guards to “report to police headquarters fifteen minutes before going on duty” so that posts could be relieved before termination of the shift, thus providing a continuity of operation.
*367 Prior to going on duty the plaintiffs were required to be in proper uniform and neat in appearance. They were permitted within reasonable limits to wear their uniforms to and from work in public or private conveyances, and some did this habitually in order to avoid having to change clothes on arrival at the guardhouse, while others wore their civilian clothes back and forth and kept their uniforms in their guardhouse lockers, changing into and out of them on arrival and departure. On arrival at the guardhouse in proper uniform or, after donning uniform upon arrival, the plaintiffs would then punch the timeclock, draw their pistols from the armory (an operation said to take approximately 20 seconds for each guard unless there were several waiting in line, in which case it would take proportionately more time), stand muster for attendance, physical inspection, and receipt of special instructions and assignments (the latter being posted a week in advance but being subject to change because of absentees, emergencies, etc.), and then proceed to their assigned posts either on foot or by vehicle depending on the distance and the nature of the assignment (i.e., patrol car, wallring or stationary post). Those assigned to vehicles would make a cursory check of the vehicle to insure its operating condition, etc. Some of the plaintiffs reported for duty to the guardhouse of their own volition as much as an hour before the start of the tour of duty, and they were able to perform their make-ready chores at leisure, but this was not required. However, the parties stipulated that, according to the available logbooks, the guards were mustered on the average of 20 minutes before the hour commencing their tour of duty. There was no written order requiring this early muster, nor is there any evidence that the Security Officer or the Chief of Police issued a verbal order to this effect, or had any knowledge that the muster was being held five minutes in advance of the time the regulation required the guards to report for duty. It is sufficient to say that the Captains of the Watches, who arrived voluntarily five minutes earlier than most of the nonsupervisory guards in order to supervise the changing of shifts, tacitly expected the guards to be available for muster at 20 minutes to the hour, to the extent that guards who showed up at quarter to the hour and thus missed the muster by a few minutes were *368 verbally admonished, although not penalized. Nor is there evidence that plaintiffs were more than admonished for failing to report for duty at any time prior to the start of the shift.
6. The regulations provided that “Guards may visit canteens on their posts for necessary meals.” No definite period or time limit was provided in the assignment schedules or otherwise in the regulations for meals. There were canteens at various locations in the Shipyard, but not one on every post, and there were fewer open in the evening shift than in the day shift. None were open in the night shift. The cafeteria was open only during the day shift. Most of the guards brought their food from home in the form of sandwiches, etc., and ate on the job at their assigned posts, that is, while walking a beat, sitting at a stationary post, or while riding in a vehicle on a patrol assignment. Under these circumstances the actual consumption of this type of meal would occupy about 10 or 15 minutes, with some natural variations. While eating the men were still on uninterrupted guard duty which took priority over meals in the event of conflict. They were permitted to purchase food “to go” at the canteens on their posts (or off their posts with special permission) if it did not interfere with performance of their duties. The canteens had no dining facilities, but were standup or carry-away operations. Guards on a vehicular patrol assignment would, on request, purchase food from the canteens for guards on stationary assignments. On infrequent occasions guards requested permission to eat at the cafeteria, and such requests were granted if there was someone available to cover their posts during their absence. This was a matter of grace rather than of right. Obviously dining at the cafeteria could not be widely available to the men for there were not enough replacements to fill in for the temporary absences. Nor does the evidence lead one to believe that the guards would have preferred to eat at the cafeteria or the canteens even if they had been available without restriction at set hours, for “brownbagging” (i.e., vernacular for bringing lunches from home) seemed to be the prevailing custom whether for financial or personal reasons. Some of the plaintiffs would be able, depending on their particular assignments, to eat *369 their food at the police headquarters, where there were facilities for making coffee.
7. There is some evidence of an inferior quality, but un-refuted, that in 1955 security officials at the Shipyard considered increasing each shift to &y2 hours, of which one-half hour would be specifically designated as a noncompensable lunch period. This would have permitted the performance of the chores preliminary to the start of the shift as described in finding 5 within the compass of a compensable 8-hour workday and without an early reporting requirement. The guards were opposed to the proposal because they did not want to be on the post 8% hours, and it was not adopted.
8. There is no record of the plaintiffs having made complaints about the early reporting requirement during any time material to this action until January 1961 when three plaintiffs filed with the commanding officer written requests for additional compensation to cover the time spent in the performance of duties prior to the commencement of the shifts. The requests were denied.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are entitled to recover. Judgment will be entered to that effect. The amount of recovery will be determined pursuant to Eule 38 (c).
It is further concluded that defendant is not entitled to recover on its counterclaim against James Powell (plaintiff No. 9 in the case of Robert B. Baker, et al., No. 323-61) and its counterclaim is dismissed without prejudice.