PeR CtmiAM:
These cases were referred to Trial Commissioner Saul Richard Gamer (now Chief Commissioner.) with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule *691 134(b). Tbe commissioner bas done so in an opinion and report filed on March 21, 1972. Exceptions to tbe commissioner’s opinion, recommended findings of fact and recommended conclusion of law were filed by plaintiffs and tbe cases bave 'been submitted to tbe court on oral argument of counsel and tbe briefs of tbe parties. Since tbe court agrees witb tbe commissioner’s opinion, findings of fact and recommended conclusion of law, as hereinafter set forth, it hereby adopts tbe same as tbe basis for its judgment in these cases. Therefore, plaintiffs are not entitled to recover and their petitions are dismissed. Defendant is entitled to recover on its counterclaim against John J. Howard, plaintiff No. 4 in Case No. 131-70 and judgment is entered to that effect in tbe amount of $180.
OPINION OP COMMISSIONER
Gamer, Commissioner:
Forty-seven plaintiffs here join in four consolidated petitions to claim, as classified civilian employees of tbe defendant, overtime compensation for work allegedly performed by them as security guards at the Philadelphia, Pennsylvania, naval installation presently known as tbe Naval Publications and Forms Center. Tbe Center was previously known as tbe Naval Aviation Supply Depot and later as tbe Naval Supply Depot. Tbe employment of some of tbe plaintiffs goes back to 1943, when the guard force (then referred to as tbe Civilian Police Force) was first established. However, tbe petitions, in view of tbe six-year statute of limitations applicable to this court,[1] seek recovery only for tbe six-year periods preceding their filing. Tbe petitions were filed on different dates in 1970. Accordingly, their claim periods commence at various times in 1964.
Tbe essence of plaintiffs’ claims is that they were required to report for duty at least fifteen minutes prior to the commencement of their eight-hour shifts and therefore worked in excess of eight hours per day and forty hours per week. 5 U.S.C. § 5542 (1970) provides that “Hours of work officially ordered or approved in excess of 40 hours in an administra *692 tive workweek * * or in excess of 8 bonrs in a day, performed by an employee are overtime work * * [2]
Among other defenses, defendant contends that, although prior to the claim periods here involved, i.e., up to September 17, 1963, the guards at the Depot were concededly required to report for work before the commencement of their shifts, the situation changed on that date. Thereafter, defendant says, and continuing up to the present, the shift hours were lengthened so as to encompass the former early reporting time periods, but with such amounts of extra time being duly offset by duty-free meal periods of equivalent length, thus leaving only eight hours as the actual daily work period.
An analysis of the record demonstrates that defendant’s defense is valid.
There can be no question but that up to September 17,1963, the guards were required to report to work at least fifteen minutes prior to the official time designated for the commencement of their shifts.[3] Such early reporting was required to accomplish certain duties prior to the times designated for the commencement of the shifts, such as receiving their guns, changing into their uniforms if they did not arrive in uniform, receiving their daily assignments, standing inspection, and relieving the off-going shift. This was a long-established practice going back to 1943. Formal regulations issued by the Depot’s Commanding Officer on October 19, 1943, placed the Security Officer in charge of the guard force and required the force to perform its duties “in accordance with orders issued by the Security Officer and approved by the Assistant to the Supply Officer in Command.” The following month, i.e., on November 24,1943, the Security Officer issued formal General Instructions to the force which were approved by the Assistant to the Supply Officer in Command. *693 The first Instruction required the guards to report “at least fifteen minutes before” the start of their tours of duty.[4] Such early reporting practice continued throughout the 1943-1963 period.[5] Furthermore, during this period, the guards received no time off for any uninterrupted lunch or meal period, nor did any regulation, instruction, or order provide for one. Most of the guards brought their lunch from home and ate while performing their regular duties on their posts.[6]
On April 5, 1963, this court handed down its decision in Albright v. United States, 161 Ct. Cl. 356. The court held that the civilian security guards of the Norfolk Naval Shipyard were entitled to recover overtime compensation under the Federal Employees Pay Act of 1945 for the fifteen minutes they were required by duly competent authority to report for duty before the designated commencement times of their shifts. Such early reporting time was required in order to perform duties similar to those performed by the guards at the Philadelphia Depot. The 15-minute early reporting time constituted overtime, the court held, since the guards did not have anything in the nature of an equivalent off-duty meal period which could be considered as an offset against such fifteen minutes.[7]
The Department of the Navy thereupon notified all of its installations employing civilian security guards, including the Philadelphia Depot, of the Albright decision. It advised that in those instances where a naval activity required early reporting of guards, the length of the workday should be *694 extended so as to encompass therein such early reporting period but that, in order that the guards would actually be required to work only eight hours per day, an equivalent time-off period for lunch, free from all duty obligations (except of an emergency nature), should be allowed.
After considering the problem, the Depot’s Commanding Officer decided to lengthen the workday of the guards by fifteen minutes, i.e., the same time they had by regulation theretofore been ordered to report early, but to give them a 15-minute uninterrupted lunch or meal break (excluding emergencies). On September 17, 1963, he ordered such new procedure to go into effect. From that date, the commencement time of each shift was advanced fifteen minutes, and the men given equivalent 15-minute duty free meal breaks, except when emergencies interfered, in which case they were later given sufficient time to make up for the time lost by reason of the emergency.[8]
On September 19,1967, the Commanding Officer, considering such factors as the length of the lines at lunchtime in the Depot’s cafeterias, extended the meal break to twenty minutes to enable the guards to eat in less hurried fashion. At the same time, he advanced the commencement time of the workday by another five minutes. Thus, the guards were from that time on officially required to report to work at twenty minutes before the hour.[9] However, because of the offsetting 20-minute meal break, they still actually performed only eight hours of work. This is the procedure that was in effect up to the dates of the filing of the petitions herein in 1970.
*695 It is thus clear that since September 17, 1968, in response to this court’s decision earlier that year in Albright, the officially ordered worktime of the security guards at the Depot has not exceeded eight hours per day or forty hours per week. Since the petitions herein were not filed until 1970, with any overtime claims preceding 1964 consequently barred by the six-year statute of limitations applicable to this court, no recovery is possible by way of these suits.
Plaintiffs argue that, since the September 19,1967 directive marked the first time that an uninterrupted lunch break was ordered in writing by the Commanding Officer or his duly authorized representative, the lunch break given prior thereto should be considered as worktime. This contention has no merit. There is no dispute about the fact that the Depot’s Commanding Officer, who had full authority in the matter, did order that, commencing September 17, 1963, the guards be given a 15-minute uninterrupted lunch break in view of their being required to report for duty fifteen minutes before the hour. This order was in fact carried out and became the new procedure at the Depot in response to Albright. It is immaterial that the order did not take the form of a formal, written directive, instruction, or regulation.
Some of the guards have complained, and still do, that the fifteen and twenty minutes allowed for the meal breaks since 1963 were and 'are insufficient, and that there have been interruptions therein. They therefore contend that such meal-break times should not be considered as appropriate offsets to the early reporting times. However, the record as a whole fails to support this contention. The distances between the duty stations and the cafeterias and snack bars are not great, and the proof shows that, after Albright and commencing September 17,1963, every effort has been made to allow uninterrupted lunch periods; that interruptions were infrequent; and that, when they have occurred, time off has been allowed to make up for them.[10] The record thus indicates no valid *696 basis for allowing any recovery with respect to any part of the 1964-1970 period.[11]
The record shows that, although Albright was decided in 1963, and plaintiffs’ situations were substantially identical with those of the security guards who recovered in Albright, it was not until 1967 (after learning that the guards at the Philadelphia Navy Yard had realized recoveries as a result of the Albright decision) that plaintiffs began presenting their claims to the Navy Department. The various Government agencies had, however, been instructed by the General Accounting Office not to pay such claims without its approval and, pursuant to instructions issued by the GAO as to the procedure that should be followed in obtaining its approval, the Navy Department selected the claim of one Depot guard as typical and submitted it to the GAO on October 27,1967. *697 Tlie guard’s claim, computed up to August 31,1967, was for fifteen minutes of overtime for the 10-year period prior thereto.[12] Further information requested by the GAO [13] was submitted by the Navy on March 28,1968.[14] On September 3, 1968, the GAO, by a Settlement Certificate issued to the guard in question, denied his claim on the ground that, on the basis of the data that had been submitted to it, it was not shown that the early reporting had, in accordance with a Navy Begulation,[15] been “ordered in advance, or approved after it has been performed, in writing, by competent authority * * Thereupon, the Depot’s Commanding Officer, on October 1, 1969, resubmitted the claim to the GAO, together with data addressed to the question that had been raised by the GAO, but, by letter of November 24, 1969, the GAO responded that GAO settlements could be reviewed by the Comptroller General only upon the request of the claimant himself.[16]
Apparently the guards then decided to abandon their attempt to obtain administrative relief and, commencing February 19,1970, began filing their suits here, but by that time the six-year statute of limitations had run with respect to the pre-September 17, 1963 period based on the 1963 Albright decision.
*698 Upon the basis of the foregoing considerations, plaintiffs are not entitled to recover.[17]
FINDINGS OF FACT
1. During all or part of the claim periods involved in these consolidated cases, i.e., six years before the filing of their petitions,[18] plaintiffs were classified civilian employees of defendant, serving as security guards at the Naval Publications and Forms Center, Department of the Navy, Department of Defense, 5801 Tabor Avenue, Philadelphia, Pennsylvania, the Center formerly being known successively as the Naval Aviation Supply Depot and the Naval Supply Depot. (The term “plaintiffs” includes the claims of employees deceased as of the dates of the filing of the petitions containing their claims pressed by their widows.)
2. By their joint petitions, plaintiffs seek to recover compensation for overtime work allegedly performed within the six years preceding the filing of their petitions.
3. Pursuant to Buie 131 (c) of the rules of this court, the parties, with the commissioner’s approval, agreed that there shall be a separate determination of the right to recovery, reserving the determination of the amount thereof, if any, for further proceedings.
4. On October 19, 1943;, the Officer in Command of the Naval Aviation Supply Depot established regulations governing all persons employed in the Depot. The regulations were “published for the guidance of all concerned as to matters peculiar to this Supply Depot.” The regulations provided:
POLICE FORCE
360. The Depot reservation security force consists of the Marine Detachment and the civilian guards.
*699 (1) The Security Officer is in charge of the Depot Civilian Police Force and will issue detailed instructions covering their duties.
(2) Civilian Police Force will perform duties in accordance with orders issued by the Security Officer and approved by the Assistant to the Supply Officer in Command. * * *
5. On November 24, 1943, General Instructions to Naval Aviation Supply Depot Civilian Police were issued by the Security Officer and approved by the Assistant to the Supply Officer in Command. The Instructions provided, in pertinent part, as follows:
GENERAL INSTRUCTIONS ARE l
1. To report to the Police Lieutenant of the Watch at least fifteen minutes before my tour of duty starts, armed and ready for duty, in correct, clean uniform.
2. To quit my post only when properly relieved * * *.
* ❖ * * ❖
17. To read the notices on the Bulletin Boards in the Police Department before going on duty * * *.
❖ * ❖ * ❖
21. The protection of the Depot is entrusted very largely to the Civilian Police. This is a large responsibility and it must be realized that the security of the Depot is dependent on the alertness of each Civilian Police Officer. I will, therefore, secure proper rest before reporting for duty so that I will be physically and mentally alert at all times.
6. On November 24, 1943, Special Orders for Police Lieutenant of the Guard — Post No. 1, Naval Aviation Supply Depot, were issued by the Security Officer an'd approved by the Assistant to the Supply Officer in Command. The Orders provided in pertinent part:
SPECIAL ORDERS ARE!
1. My post is in the Police Office, Boom 111, Administration Building. (Bldg. 1)
2. To see that all posts are properly and completely manned before my shift begins.
7. On or before November 8, 1954 (when Security Division Instruction 5510.2 was issued), Security Division In- *700 sfcruction 5510.1, Philadelphia Naval Aviation. Supply Depot, from the Security Officer to the Security Division, was issued, which provided in pertinent part:
2. scope. This INSTRUCTION is based upon the security policies of the Commanding Officer, NASD [Naval Aviation Supply Depot] and higher authority, and establishes a definite guide to assist in standardizing the administration of the Security Police.
* * * * *
5. GENERAL INSTRUCTIONS.
(a) NASD Security Police shall be governed by the General Instructions outlined below, in addition to Special Orders, Security Instructions and Notices, Instructions from the Captain of the Police Force and/or the Police Officer in charge of the watch:
(1) To report to the Police Officer in Charge of the watch at least fifteen minutes before my tour of duty begins, armed and ready for duty, in clean and correct uniform.
(2) To quit my post only when properly relieved
8. On July 31,1961, the Department of the Navy, Office of the Chief of Naval Operations, issued, as OPNAY Instruction P5510.45A, United States Navy Physical Security Manual. The Manual set forth the “policies and criteria for planning, implementing, and evaluating physical security measures throughout the Naval Shore Establishment.” The Manual provided in pertinent part:
0434. guard orders. The concept of guard orders is as follows:
a. Guard orders are the written and approved authority for the members of the guard to execute and enforce such orders and regulations as the commanding officer of an activity may prescribe.
b. All guard orders should specify the limits of the post, specific duties, the hours/times the post is to be manned, and the uniform, arms and equipment prescribed for members of the guard.
c. All guard orders should be brief, concise, and specific. They should be prepared in the affirmative and written in clear and simple language. They should avoid ■unnecessary repetition and referral to the “do’s and don’ts” normally covered in guard school.
*701 d. Guard orders for military and civilian guards will be approved by tlie commanding officer. * * *
0445.4 PERSONAL SUPERVISION. Where a guard force consists of a large number of full-time guards, personal supervision is necessary. Personal supervision should include the following:
a. Each guard should be inspected by his supervisor prior to reporting for duty. At this time, he should be given any special instructions or orders.
b. Each guard post, patrol, or other activity should be contacted by supervisors at least once per shift to determine that the personnel and system are functioning properly.
c. Inspection when coming off duty should also be mandatory.
9. On April 10, 1962, Security Guard Orders were issued by the Philadelphia Naval Supply Depot’s Commanding Officer, acting pursuant to the aforementioned July 31, 1961 Instruction from the Chief of Naval Operations. The “Letter of Promulgation” of such Orders stated:
1. Reference (a) requires that guard orders be established to set forth the written and approved authority for members of the guard to execute and enforce such orders and regulations as the Commanding Officer may prescribe. Realizing the extremely important responsibility the Security Guards of this command have in providing security to this Depot there is an ever present need to supply guide lines for their performance of duties. To ensure that such is provided, subject orders are herewith promulgated so that all Security Guards have knowledge of and understand what is required of them.
2. By this letter of promulgation, the Security Officer is directed to ensure that all Security Guards read, understand and properly perform the duties established in these orders.
Such Orders provided in part as follows:
POST NO. 1 (POLICE HEADQUARTERS DESK)
1. Post #1 (Police Headquarters Desk) is a fixed control post established to operate as the central control point of all guard operations. This post is physically located in Room 115, Building #1 and operates 24 hours a day seven days a week. The duties of the post being *702 varied require the guard assigned to have a full knowledge of all guard force procedures and command security regulations. Guards will be assigned this post only after detailed training and they have shown ability to assume the duties. General Outline of duties is as follows:
a. Maintain control over shift operations where necessary relaying to outlying posts special duties, details or changes to instructions. Make certain that all posts are manned and that guards are properly relieved at one-quarter of the hour on change of shift.
10. (a) The position hereinabove referred to of Assistant to the Supply Officer in Command was, prior to August 1962, changed to that of Executive Officer. The chain of command at the Center runs from the Commanding Officer down successively to the Executive Officer, the Administrative Officer, the Security Officer, and the Chief of Police.
(b) The Administrative Officer had five divisions under him, one of which was the Security Division. Both the Security Officer and the Administrative Officer were authorized to approve overtime of an unscheduled emergency nature.
11. (a) From the time the Philadelphia Naval Supply Depot guard force was formed in July 1943 and continuing to September 17, 1963, the security guards were on a three 8-hour shift basis. During such period the hours of the shifts were officially designated as follows:
First — 7 a.m. to 3 p.m.
Second — 3 p.m. to 11 p.m.
Third — 11 p.m. to 7 a.m.
As set forth in finding 5, the guards were, however, officially ordered to report to work “at least” fifteen minutes before the commencement of their shifts. The Security Officer determined that the daily early reporting time should constitute twenty minutes and issued oral orders to such effect. That practice, pursuant to such orders of such official, and enforced by the supervisory guard officials (the lieutenants and sergeants) continued throughout such period, the guards reporting for work at their central check-in point, the Police Office in the Administration Building, twenty minutes prior to the commencement of their shift times as hereinabove specified. Such early reporting was required to enable the *703 guards to perform such, duties as receiving and signing for their guns, changing into their uniforms if they did not arrive in uniform, receiving their daily assignments and orders, standing inspection, receiving the keys to their buildings or stations, and allowing for timely relief of the off-going shift. The guards attempted to relieve the posted guard on the outgoing shift around ten minutes before the end of the shift so that the outgoing guard would have sufficient time to return to the Police Office in the Administration Building, which was also the checkout station, and leave by the end of his shift túne. Considering the distances involved between the Administration Building, at which the guards reported in for duty, and the locations of the various posts, and the fact that most of the guards reported in already wearing their uniforms (which was permitted) and could use their automobiles to go to their posts, twenty minutes was sufficient time for the performance of the described duties.
(b) No designated off-duty time for any uninterrupted lunch or meal period during the 8-hour shift was provided during this period, the guards being required to eat any such meal, which most brought from home, at their posts while continuing to perform their regular duties. As a matter of practice, however, they were relieved for very brief periods to allow visits to the restroom, and to obtain a “snack.” Since the posts were required to be manned continuously during their entire period of operation, no guard could leave his post for such purposes unless he was properly relieved. The guards were not compensated for the time involved in their reporting to the Administration Building prior to the commencement of their tours of duties.
12. (a) By a “Notice” dated August 27,1962, the Office of Industrial Relations, Department of the Navy, circularized to naval installations employing civilian guards an opinion of a Court of Claims Trial Commissioner in the case of Albright v. United States, Ct. Cl. No. 263-61. The Trial Commissioner determined that security guards of the Norfolk Naval Shipyard were entitled to recover overtime compensation for the twenty minutes they were required to report in before the designated commencement time of their shift *704 tours of duty. Such early reporting was required in order to perform miscellaneous duties such as those performed by the guards at the Philadelphia Depot. The Trial Commissioner concluded that the guards in the case before him did not have anything in the nature of an off-duty meal period equivalent to the 20-minute early reporting period and which could be considered as an offset against such twenty minutes.
(b) The “Notice” stated that “[i]n view of the possible impact of the tentative opinion,” if early reporting time by guards was required by an installation, “the length of the shift or workday should be extended from 8 hours to a minimum of 8% hours with at least thirty minutes of time off for lunch. It should be made clear to all concerned that the lunch period is free from all duty obligations except of an emergency nature.”
13. By a memorandum dated April 8, 1963, to the Commanding Officer of the Depot, the Administrative Officer of the Depot (M. F. Barton, Jr.) considered the Commissioner’s opinion in the Albright case. He stated that it “could require compensation for chores performed by guards prior to the official start of a shift.” He advised the Commanding Officer that “the Security Guards of the NSD are presently scheduled on a three shift, 8 hour day basis as follows: 0700 to 1500; 1500 to 2300 and 2300 to 0700. In order to accomplish miscellaneous duties and allow for timely relief of the off-going shift, they are required to report 20 minutes before the official start of the shift,” that “[t]hese circumstances are almost identical to those described” in the Albright case, “and indicate that the local schedules should be revised.” He therefore recommended to the Commanding Officer that “if early reporting is required, the length of the shift or workday should be extended from 8 hours to a rm'rnmmn of 8y2 hours with at least thirty minutes of time off for lunch.” The memorandum also considered what the effect of such a rescheduling would be on guard and security operations, including overtime.
14. (a) On April 5, 1963, i.e., three days prior to the Administrative Officer’s memorandum referred to in finding 13, the Court of Claims had rendered its decision in the *705 Albright case (161 Ct. Cl. 356). The court adopted the Trial Commissioner’s opinion except that it reduced the overtime recovery from twenty to fifteen minutes, which was the amount of time the guards at the Shipyard had been required, by written regulations, to report before going on duty. Although the guards had in fact reported in twenty minutes early, the court concluded that the record in the case did not indicate that anyone higher than the Captains of the W atch (the direct supervisors of the guards) had given any order requiring reporting in five minutes before the time specified in the regulation. The court held that there was no showing that such Captains had authority to order or approve overtime. Although the record indicated that the Security Officer and the Chief of Police had such authority, it further showed that neither of them even knew about the practice. As to such five minutes, therefore, the court held that there had not been an “official order or approval” as required by the Federal Employees Pay Act of 1945, as amended.
(b) On May 28, 1963, the Chief of Industrial Eelations, Department of the Navy, sent a Notice to all naval activities employing civilians advising them of the court’s Albright decision. The Notice stated that:
3. Applicability. As a result of this decision, it has been decided that the performance of duties preliminary to the start of the shifts as described in 2b., above is compensable. Therefore, all activities will assure that the normal duty hours of a shift do not exceed 8 hours. If it is required that there be an overlap between the shifts, this should be accomplished by scheduling a non-work lunch period equivalent to the amount of the overlap. It should be made clear to all affected personnel that a scheduled lunch period is free from all duty obligations except of an emergency nature.
(c) On June 6,1963, the Depot’s successor Administrative Officer (J. E. Lynch, Jr.) submitted another memorandum to the Commanding Officer similarly recommending that “the length of the shift or workday should be extended from 8 hours to a minimum of 8% with at least thirty minutes of time off for lunch.” The memorandum also made an analysis of what the effects of such a change would be and *706 bow they could be met, including the possible employment of additional personnel and the use of “additional overtime at peak periods.”
15. (a) After considering the problem and the April 8,1963 and June 6, 1963 recommendations of the Administrative Officers, the Commanding Officer decided that the guards should have an uninterrupted lunch or meal break equivalent to the time that they had, pursuant to the formal written regulations or instructions approved by the Commanding Officer, been reporting in early, i.e., fifteen minutes. However, since, on the basis of the then currently designated shift hours, this would leave only 7% hours of work, he further decided that the tours of duty should be equivalently lengthened by fifteen minutes so that each guard would still perform eight hours of work per day. This would be effected by changing the guards’ tours of duty by adding fifteen minutes to the commencement thereof, as follows:
First — 6:45 a.m. to 3:00 p.m.
Second — 2:45 p.m. to 11:00 p.m.
Third — 10:45 p.m. to 7:00 a.m.
In this way, the former early reporting time required by the Commanding Officer or his duly authorized representative would now, by being incorporated into the official shift time, be recognized as worktime to be compensated for (as required by the Albright decision), as part of the 8-hour workday, the 15-minute lunch break not to be counted as worktime. On September 17,1963, the Commanding Officer ordered that the guards’ tours of duty be so lengthened and that, excluding emergencies, they be given a 15-minute uninterrupted lunch or meal break. The record contains no document containing such instructions or orders in writing. However, such orders were duly conveyed to the appropriate officials and were carried out.
(b) Thereupon, from September 17, 1963, and until September 24, 1967, the guards were, excluding emergencies, and in accordance with the aforementioned orders of the Commanding Officer, granted a 15-minute duty-free break period to consume or procure a meal. On occasion personnel shortages disrupted the granting of the 15-minute break pe *707 riod to all guards on all shifts. However, these were infrequent occurrences, primarily on the day shift, which supervisors attempted to avoid. When, in the infrequent situation of an interruption in the guard’s 15-minute meal period, the guard was normally able to complete his meal after the interruption. Such complaints of the guards concerning the 15-minute break as occurred were principally grounded on the shortness of the period of time, rather than on any regular failure to receive the break.
(c) During such period the guards continued to report in to the Police Chief, as they had previously, at approximately twenty minutes to the hour. The shifts were still referred to as commencing on the hour, i.e., “the 7:00 a.m. shift,” even though they were officially now considered as commencing fifteen minutes before the hour. The time sheets that were used during this period, indicating the daily duty time of each guard, were the same sheets that had been used previously and which designated, for instance, the daytime shift as “7:00 a.m. to 3:00 p.m.”
(d) During this period, as well as prior (and subsequent) thereto, some guards, either because they used public transportation, or for other reasons personal to them, voluntarily reported in prior to 6:40 a.m.
16. NCPI 610 (Navy Civilian Personnel Instructions), dated July 22,1965, provides in pertinent part as follows:
3-2. OVERTIME WORK.
‡ ‡ ‡
b. OVERTIME MUST BE ORDERED OR APPROVED.
(1) Overtime work must be ordered in advance or approved after it has 'been performed, in writing, by competent authority, in order to be compensable. Overtime may be ordered or approved in blanket form for a group or class of employees.
(2) Chiefs of bureaus and offices, activity commanding officers, and military and civilian personnel designated by them, are authorized to order or approve overtime. * * *
c. MINIMUM OVERTIME INCREMENTS CREDITED.
Activities are authorized to credit and pay overtime by either of the following methods:
(1) In increments of hours and quarter hours. Where *708 this method is used, the minimum overtime credit is 15 minutes.
(2) In increments of hours and tenths of hours. Where this method is used, the minimum credit is 6 minutes. EXCEPTION: *In the case of graded employees,* activities which desire to do so, may credit actual minutes of overtime on a daily basis and divide the total at the end of the week 'by either 15 or 6, depending upon the method used, to determine the number of hours and fractional hours of overtime payable.
*d. CREDITING OVERTIME.*
*****
Where the quarter hour increment method is used, an employee who worked 50 minutes of overtime would be paid for 45 minutes of overtime. Where 6-minute increments are used, the same employee would be paid for 48 minutes of overtime. However, see EXCEPTION under 8-2c above.
e. REGULAR OVERTIME.
All regular overtime is paid at the appropriate prescribed rates.
f. IRREGULAR OR OCCASIONAL OVERTIME.
Irregular or occasional overtime is overtime which was not scheduled prior to the beginning of the administrative workweek in which it occurs.
17. (a) In early 1967, some of the guards at the Depot were advised that the guards at the Philadelphia Navy Yard had received payment for overtime on the basis of the Al-bright decision. These Depot guards felt that they too were entitled, on the basis of Albright, to overtime compensation for the fifteen minutes they had been required, by official orders, to report prior to the commencement of their shifts. The guards then inquired of the Depot’s Industrial Relations Department and the Fiscal Officer concerning the manner in which their claims should be processed.
(b) After the Albright decision, both the General Accounting Office and the Department of the Navy received a number of guard claims from various naval installations. By a memorandum of February 6,1964, the Office of the Comptroller, Department of the Navy, advised those naval installations which employed guards, including the Depot, that *709 such claims should not be paid locally without the specific approval of the General Accounting Office. The installations were further advised of the data the GAO would require with respect to such claims. As to the procedure to be followed in the submission of the claims, the installations were instructed, where a group of claims had previously been submitted to the GAO by the installation, to select a typical case, to research it, to prepare a report on it, and to forward the report to the Navy Finance Center for attachment to the employee’s original claim. The memorandum stated further that the procedures set forth therein were also applicable to claims received by installations which had not previously submitted any guard claims on the basis of Albright.
(c) The Depot, upon consideration, concluded that it would present the guards’ claims in accordance with the procedure specified in the Comptroller’s memorandum of February 6,1964, and for such purpose selected, as a typical case, the claim of one John E. Chichester for presentation to the GAO. Chichester had been a guard at the Depot since 1943.
18. (a) Prior to September 19, 1967, the Chief of the Depot’s Police Branch (his rank being that of captain) concluded that, considering such factors as the length of the lines in the cafeterias at lunchtime, the guards’ meal periods should, to enable them to eat in less hurried fashion, be lengthened from fifteen to twenty minutes. To effect such a change, the guards’ tours of duty would, however, similarly have to be lengthened by five minutes. By a memorandum of such date to the Depot’s Executive Officer, the Chief (W. C. Price) recommended that the guards’ hours of work be changed so as to commence at 20 minutes instead of 15 minutes before the hours of 7 a.m., 3 p.m., and 11 p.m. TTis memorandum further stated:
3. With this change in the tour of duty the guard will be required to be at his assigned post ten (10) minutes of the hour and relieved ten (10) minutes before the end of his tour of duty.
4. This time will allow the guard to report in, muster, draw the revolver, sign log sheet, receive any special instructions pertaining to the post to which he is assigned.
5. It is requested that this change be effective starting 0640 — 24 September 1967.
*710 (b) The Commanding Officer (Captain D. F. Anderson) accepted the recommendation of the Chief of the Police Branch and, by memorandum issued the same day, so ordered, as follows:
1. As requested in reference (a), commencing on Sunday, 24 September 1967 the hours of work for Security Guard Personnel in the Security Division, Police Branch will be as follows:
Section 1 (First Shift) 0640 to 1500
Section 2 (Second Shift) 1440 to 2300
Section 3 (Third Shift) 2240 to 0700
2. Within these duty hours each guard will be provided a scheduled twenty-minute break for lunch or other purposes thereby constituting a work period not exceeding eight (8) hours.
3. By copy of this memorandum, concerned components will adjust their records accordingly and take such other action necessary to effect this official change.
(c) This was the first Commanding Officer’s order in writing providing that the guards receive an uninterrupted meal break. Also, since the Commanding Officer directed that the “concerned components will adjust their records accordingly and take such other action necessary to effect this official change,” the official time sheets were thereafter changed so as to show that the shifts actually commenced at twenty minutes to the appropriate hour, thus changing the practice of still using the old time sheets that had been used since the establishment of the guard force in 1943, which showed the shifts as commencing on the hour despite the fact that, since September 17,1963, the tours of duty had been changed so as to commence at 15 minutes before the hour.
19. From September 24, 1967 to the present, a 20-minute duty-free lunch or meal period has (excluding emergencies) been provided the guards. Such guard complaints as there are regarding this break period stem from the feeling on the part of some guards that twenty minutes is still not a long enough period in which to obtain and eat a meal. As they had previously, the guards still reported in at the Police Office at twenty minutes to the appropriate hour except that now such full twenty minutes of early reporting *711 time was officially ordered in writing by the Commanding Officer.
20. On October 27, 1967, the Commanding Officer of the Depot submitted Chichester’s claim to the General Accounting Office, supplying such data as he felt complied with the aforementioned Notice of the Navy Department dated February 6,1964. The claim was for fifteen minutes of overtime per day from August 31, 1957 to August 31, 1967. Included in the supporting data was payroll information of the claimant for the period of his claim, together with his rate of pay for various periods, and his total overtime (excluding days he was on leave) based on fifteen minutes per day. For such period, so computed, the claim amounted to $2,045.07. Also included was a memorandum containing information concerning the working hours of the guards, including meal periods, since 1943. The memorandum stated, among other things, that up to September 17, 1963, the guards were “not on an uninterrupted lunch break”; that, commencing on that date, “the guard was given a fifteen (15) minute uninterrupted lunch break (excluding emergencies) which was compensated by his reporting in fifteen (15) minutes early”; and that “the change of shift hours directive issued 24 September 1967 provides a twenty (20) minute uninterrupted lunch period for all guards. The guards assigned to the various posts have free access to cafeterias/snack bars during their lunch breaks. * * * There are no posts too distant from eating facilities * * *. Minimal complaints have been received by superiors of guards whose lunch hours were necessarily changed due to a shortage of guards or unusually long lines in the cafeteria.”
21. The General Accounting Office desired further information with respect to Chichester’s claim which it requested by letter of January 8,1968, to the Office of the Comptroller of the Navy in Washington, D.'C. The GAO letter also pointed out that, since the claim had not been received by it until October 30, 1967, the portion thereof from August 31, 1957 to October 30,1957, was barred by the ten-year statute *712 applicable to the 'Comptroller General. The letter further requested “your recommendations in the matter.”
22. By letter of March 28,1988, the Commanding Officer of the Navy Finance Center, Washington, D.C., furnished the GAO with additional data concerning the Chichester claim. The amount of the claim was recomputed so as to eliminate the period from August 81, 1957 through October 29, 1957, the claim thereby being reduced to $2,017.27. The letter further stated:
Favorable consideration is recommended on the basis of the decision rendered in the case of Albright et al. v. the United States, Court of Claims No. 323-61.
No payment has been or will be made prior to approval by your Office.
As this is a typical case from a group of claims being held pending your decision it would be appreciated if you will furnish advice as to whether similar claims, with supporting evidence, may be settled locally without referral to your Office.
Copies of the letter were sent to the Commanding Officer of the Depot and to Chichester.
23. On September 3, 1968, the General Accounting Office, by a Settlement Certificate letter to Chichester, denied his claim. That part of the claim prior to October 30, 1957, ten years prior to the date the claim was received in the General Accounting Office, was disallowed as being beyond the ten-year period applicable to such Office. As to the balance of the claim, the letter stated in part as follows:
Sections 85.3-1 (a) and (b) of the Navy Civilian Personnel Instructions (1954) provided as follows:
a. Ordered or approved. — Overtime must be ordered in advance, or approved after it has been performed, in writing, by competent authority, in order to be creditable for pay or compensatory time purposes. Overtime that is neither ordered in advance nor approved after it is performed by competent authority, is not com-pensable. * * *
b. Authority to order or approve overtime — Chiefs of bureaus and offices, commands of activities, and military and civilian personnel designated by them, are authorized to order or approve overtime. * * *
Similar regulatory provisions remained in effect throughout the period of your claim. The Department *713 of the Navy has advised that no local written orders have been found requiring 15 minutes early reporting on the part of guards at the Naval Supply Depot, Philadelphia, Pennsylvania. Although the practice of early reporting for Security Guards may have been ordered orally by the Security Officer, he was not an official who had been authorized to order or approve overtime.
* ❖ * * #
In your case the regulation requiring authorization or approval in writing by certain designated officials does not appear to be unreasonable. On the basis of the present record, it camiot be concluded that the payment of overtime compensation for early reporting was ever authorized or approved in writing by a properly designated official as required by the applicable regulations. And neither does it appear that any properly designated official actively induced or encouraged the early reporting.
24. (a) The then Commanding Officer of the Depot (Captain Lewis), the name of which had been changed to the Naval Publications and Forms Center, decided to resubmit the Chichester claim to the General Accounting Office. By a memorandum dated October 1, 1969, he so resubmitted the claim. He stated therein that he agreed that the period of the claim prior to October 30,1957, was barred. With respect to other periods of the claim, however, he submitted the Administrative Officer’s memorandum of April 8, 1963, to the Commanding Officer (finding 13) as constituting “written evidence” that the guards “are required to report 20 minutes before the official start of the shift.” He also stated that, “[t]o preclude further claims,” the guards’ tours of duty had been changed on September 24, 1967, a memorandum of September 19, 1967, to the Commanding Officer from the Depot’s Planning Officer recommending the new procedure also being submitted. In view of the additional data submitted, the Commanding Officer requested that the claim be reconsidered.
(b) The Commanding Officer of the Forms Center forwarded his reconsideration request through the Comptroller of the Navy (and the Commander, Naval Supply Systems Command). The Comptroller in turn forwarded it to the Commander, Navy Accounting and Finance Center. By a “Second Endorsement” dated October 24, 1969, the Com *714 mander of the Accounting and Finance Center “forwarded for reconsideration” the Forms Center’s Commanding Officer’s memorandum of October 1, 1969, to the General Accounting Office.
25. On October 15, 1969, the Commanding Officer of the Naval Publications and Forms Center (Captain Lewis) issued comprehensive Security Guard Orders “so that all Security Guards have knowledge of and understand what is required of them.” Included therein was the following:
3. HOURS OF DUTY
Except in an emergency, eight hours constitute a regular tour of duty. The specific starting time is as follows:
0640-1500 (7/3 shift)
1440-2300 (8/11 shift)
2240-0700 (11/7 shift)
The guard must clock in by 0640 hours, must relieve the man on post by 0650 hours and will be relieved by the guard on the oncoming shift (3/11) by 1450 hours. The same procedure will be followed by other shifts.
For time required above the eight hours tour of duty, which in this case is twenty minutes — a like amount will be given as a lunch period. This lunch period will be uninterrupted except for emergency purposes.
26. By letter of November 24, 1969, the General Accounting Office advised the Commander, Navy Accounting and Finance Center, in reference to the latter’s request for reconsideration of Chichester’s claim, that General Accounting Office settlements could be reviewed by the Comptroller General only upon the request of the claimant himself or his duly authorized representative, or the head of the department involved, and that, in the absence of such a request for review, further action on the claim could not be taken.
27. (a) The Center is 135 acres in area. When established in 1943, it had one cafeteria located in 'Building 15. Additional cafeterias were added in Building 38 in 1953 and in Building 3 in 1963. There is one snack bar in Building 36. Cafeteria hours are 7-8 a.m. for breakfast; 9-10 a.m. for a coffeebreak; 11 a.m.-l p.m. for lunch; and 2-3 p.m. for an afternoon coffeebreak. Until 1970, dinner service was avail *715 able from 4-6 p.m. in the Building 15 cafeteria. Vending machines, from which hot soup and sandwiches may be obtained, are available on a 24-hour basis.
(b) The record does not sustain the contention that because of long lines at the cafeterias, or the distance of the cafeterias from the guard posts, or the shortage of guards due to turnover, a period of twenty minutes is insufficient for a meal or lunch period for the guards.
28. There are presently fourteen posts to be manned on the day shift by fourteen guards. The number of posts has varied from 1943, when there were about twenty-five. The smallest number was nine, located as follows:
Two in the Police or Security Office, where there is a guards’ locker room; one at the Oxford Avenue gate; one in Building 8; one in Building 9; one at the Cheltenham Avenue vehicle gate; one known as the Godfrey post; and one known as the lower end post. There is also a one-man patrol car. Formerly there had been two patrol cars. Except for the patrol car, all posts are either stationary or foot patrols. No guard is permitted to leave his post until relieved.
In the Security Office are the Security Officer, the Police Chief, the Assistant Chief, and the Police Lieutenant on the 6:40 a.m. to 3 p.m. shift. The Security Officer is succeeded by the Duty Officer at 4:30 p.m. A Duty Officer or Guard Sergeant is on duty until 7 a.m. The guard uniform is comprised of hat, badge, shirt, blue pants, navy-type shoes, blue socks, uniform jacket, and overcoat.
COUNTERCLAIM
29. In April 1963, the wife of plaintiff John J. Howard (plaintiff No. 4 in petition No. 131-70) was hospitalized at the United States Naval Hospital in Philadelphia, Pennsylvania. Plaintiff was a member of the United States Army. Mrs. Howard was hospitalized for a period of five days, at a rate of $36 per day, for which the sum of $180 remains unpaid. Plaintiff Howard has not denied the validity of defendant’s counterclaim for the hospital services rendered to his wife by defendant.
*716 CONCLUSION OIF LAW
Upon the foregoing findings of fact and opinion, which, are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover and their petitions are dismissed. Defendant is entitled to recover on its counterclaim against John J. Howard, plaintiff No. 4 in Case No. 131-70, and judgment is entered to that effect in the amount of one hundred eighty dollars ($180).

 28 U.S.C. §§ 2401, 2501 (1970).

 80 Stat. 485 (1966) as amended, 81 Stat. 200 (1967), which superseded the Federal Employees Pay Act of 1945, 5 U.S.C. § 911 (1958), 59 Stat. 295, as amended, 68 Stat. 1109 (1954). That Act provided that “All hours of work officially ordered or approved in excess of forty hours In any administrative workweek * * * shall be considered to he overtime work * *

 The guards were then on a three-shift basis, each shift consisting of eight hours. The shifts were officially designated as follows :
First — 7 a.m. to 3 p.m.
Second — 3 p.m. to 11:00 p.m.
Third — 11 p.m. to 7 a.m.

 The Security Officer determined that such early reporting period should be twenty minutes, and orally so ordered.

 A Security Division Instruction, issued on or before November 8, 1954, “based upon the security policies of the Commanding Officer,” and a Security Guard Order issued by the Commanding Officer on April 10, 1962, perpetuated the early reporting practice first promulgated in 1943.

 There was a practice during this period, however, of relieving the guards for very brief periods to allow visits to the restroom or to obtain a “snack.”

 As in the instant case, the Norfolk Navy Yard guards had, pursuant to the oral order of a supervisory official, actually reported twenty minutes early. However, the court allowed only the fifteen minutes officially required by competent authority as compensatory because the record in the case did not show that the official who orally ordered the additional five minutes early reporting had authority to so order or approve overtime, as required by the Pay Act. The plaintiffs here now claim compensation for only fifteen minutes of their early reporting time. Plaintiffs’ Brief to the Commissioner, p. 2. (In their petitions, they claimed twenty minutes.)

 The new shift times were as foUows:
First — 6:45 a.m. to 3 :00 p.m.
Second — 2:45 p.m. to 11:00 p.m.
Third — 10:45 p.m. to 7:00 a.m.
However, the guards still continued to report to work twenty minutes to the hour. Defendant contends (a) the record does not indicate that the Security Officer was at the pertinent time authorized to order a lengthening of the official workweek, and (b) the extra five minutes is, in any event, “de minimis.” Since plaintiffs now claim only fifteen minutes, however (n. 7 supra), it is not necessary to decide these contentions.

 As shown, they had been consistently so reporting anyway pursuant to the oral orders of the Security Officer. The newly designated shift times thus became as follows:
First — 6:40 a.m. to 3 :00 p.m.
Second — 2 :40 p.m. to 11:00 p.m.
Third — 10 :40 p.m. to 7 :00 a.m.
The order became effective on September 24,1967.

 One of the guard witnesses (the Chief of Police at the time he testified) conceded at the trial that the guards had no valid claim for the period subsequent to September 24, 1967, because “We have a twenty-minute uninterrupted lunch period,” and that twenty minutes was enough time to allow every guard to go from his assigned post to a cafeteria and to return. Transcript, p. 41.

 One of the guards, i.e., the Chief of Police (n. 10 supra) variously testified that, from September 17, 1963, when the shift times were extended fifteen minutes, and up to 'September 24, 1967, when they were extended another five minutes, the guards were required to report for duty thirty minutes before the hour. Tr., pp. 30-31, 50. If this were so, then they would still have been working eight hours and fifteen minutes per day during such period since they received only a 15-minute meal break. However, his entire testimony in this respect becomes quite confusing since elsewhere he inconsistently states that the period when the guards were required to report at 6:30 a.m. was prior to 1955 (Tr., pp. 45, 48), and that, commencing in 1963, they had to report for duty by only a quarter of the hour, fifteen minutes being sufficient to perform their preliminary duties and to effect timely relief of the guards on the posts. Tr., p. 46. He further testified that during the 1963-1967 period, although the shifts had actually been changed so as to commence at a quarter of the hour, the Depot still used the old log or time sheets showing the shifts as commencing on the hour (the shifts being still commonly referred to as so commencing, i.e., “the 7 :00 a.m. shift”) but that the guards actually reported for duty at a quarter to the hour (as they had previously) and in turn received a 15-minute lunch period. Tr., pp. 47 — 48.
No other guard or witness testified to any requirement after September 17, 1963, that the guards report one-half hour before the hour. Furthermore, the exhibits do not lend themselves to any such construction. It would, indeed, have been a strange way to meet the problem posed by the Albright case, for in still leaving fifteen minutes of uncompensated worktime, it would not have met it at all.
Accordingly, if any of the guards are actually contending that they are entitled to recover for fifteen minutes’ overtime during the September 17,1963— September 24, 1967 period because they were required to report to work at 6:30 a.m., then it must be concluded that they have failed to meet their burden of proof in this respect. Plaintiffs’ briefs, it should be noted, do not explicitly make any such contention, nor can they be read as implying it. Such contention would, furthermore, be inconsistent with plaintiffs’ claim for fifteen minutes’ overtime since, in view of their argument that the 15-minute “lunch break” should be counted as worktime, their claim would then have to be for thirty minutes of overtime during such period.

 In submitting the guard’s claim, the Nayy Department informed the GAO that up to September 17, 1963, the guards were “not on an interrupted lunch break,” but that, commencing on such date, “the guard was given a fifteen (15) minute uninterrupted lunch break (excluding emergencies) which was compensated by his reporting in fifteen (15) minutes early,” and that “the change of shift hours directive issued 21 September 1967 provides a twenty (20) minute uninterrupted lunch period for all guards.”

 The GAO also observed that, since it had not received the claim until October 30, 1967, the 10-year statute of limitations applicable to it would bar compensation for the period prior to October 30,1957.

 In response to the GAO’s specific request for a Navy recommendation in the matter, the Navy stated that “Favorable consideration is recommended on the basis of the decision rendered in the case of Albright et al. v. The United States * * In view of the data it had previously submitted to the GAO (n. 12 supra), the Navy’s recommendation can only be taken to mean that it felt that the guards had, under Albright, valid claims for the approximately 6-year period of October 30,1957 to September 17,1963.

 Navy Civilian Personnel Instructions (195A) sees. 85.3-1 (a) and (b).

 Or the head of the department involved which, in this case, would apparently be the Secretary of the Navy, and not the Commanding Officer of the Depot.

 Defendant Ras filed a counterclaim against one of the plaintiffs In the amount of $180 for medical services rendered to his wife at a naval hospital in Philadelphia during a period of time when the plaintiff was serving In the Army. The plaintiff involved does not contest the debt owed to defendant for such services.

 The dates of the filing of the petitions are as follows:
1. Catalfamo et al., No. 67-70 — February 19, 1970.
2. Bray et al., No. 84-70 — March 6,1970.
3. Bernstein et al., No. 131-70 — April 20,1970.
4. Morrell and White, No. 291-70 — August 21,1970.